1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2
                      15-20264-CR-LENARD/GOODMAN
3

4
UNITED STATES OF AMERICA,        )
5                                )
                 PLAINTIFF,      )
6                                )
          VS.                    )
7                                )
MIGUEL MORAN DIAZ,               )
8                                )
                 DEFENDANT.      )
9    _____)

10                    (TRANSCRIPT BY DIGITAL RECORDING)

11

12           TRANSCRIPT OF PRETRIAL DETENTION HEARING HAD BEFORE

13  THE HONORABLE CHRIS M. MCALILEY, IN MIAMI, MIAMI-DADE COUNTY,

14  FLORIDA, ON APRIL 8, 2015, IN THE ABOVE-STYLED MATTER.

15

16
APPEARANCES:
17
FOR THE GOVERNMENT:  MARC S. ANTON, A.U.S.A.
18                   99 NORTHEAST 4TH STREET, 8TH FLOOR
                     MIAMI, FL 33132 - 305 961-9287
19
FOR THE DEFENDANT:   ANTHONY NATALE, A.F.P.D.
20                   150 WEST FLAGLER STREET
                     MIAMI, FL 33130 - 305 530-7000
21

22

23                    CARL SCHANZLEH, RPR - CM
                      CERTIFIED COURT REPORTER
24                     9960 SW 4TH STREET
                    PLANTATION, FLORIDA 33324
25                       954 424-6723

1

2                          TABLE OF CONTENTS

3    WITNESSES:                    DIRECT  CROSS REDIRECT RECROSS

4    DAVID CHANCY ............................. 9

5                          INDEX TO EXHIBITS

6    EXHIBITS                    MARKED FOR      RECEIVED
                                 IDENTIFICATION  IN EVIDENCE
7
     DESCRIPTION                    PAGE    LINE    PAGE    LINE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  (MIAMI, MIAMI-DADE COUNTY, FLORIDA;  APRIL 8, 2015, IN OPEN

2  COURT.)

3      THE COURT:  OKAY.  MIGUEL MORAN DIAZ, 15-2444-GOODMAN.

4      MR. ANTON:  GOOD MORNING, YOUR HONOR.  MARC ANTON ON

5  BEHALF OF THE UNITED STATES.

6      THE COURT:  OKAY.

7      MR. NATALE:  GOOD MORNING, YOUR HONOR.  ANTHONY NATALE

8  FROM THE FEDERAL PUBLIC DEFENDER'S OFFICE ON BEHALF OF

9  MR. DIAZ.

10      THE COURT:  ALL RIGHT.  SO ON WHAT GROUNDS IS THE

11  GOVERNMENT ASKING TO HAVE THE DEFENDANT DETAINED?

12      MR. ANTON:  YOUR HONOR, WE ARE ASKING BASED ON RISK OF

13  FLIGHT AS WELL AS DANGER TO THE COMMUNITY.

14      I WOULD ADD TO THE COURT THAT WE HAVE BEEN UNABLE TO

15  REACH AN AGREEMENT REGARDING A BOND IN THIS CASE AND THAT THERE

16  HAS BEEN A COMPLAINT FILED THAT WAS DOCKETED ON APRIL 6TH OF

17  2015, AND THE GOVERNMENT WOULD BE RELYING IN TERMS OF ITS

18  PROFFER ON THE AFFIDAVIT CONTAINED WITHIN THE COMPLAINT WITH A

19  FEW ADDITIONAL --

20      THE COURT:  OKAY.  I HAVE NOT READ THAT COMPLAINT SO

21  YOU NEED TO TELL ME --

22      MR. ANTON:  OKAY.

23      THE COURT:  -- WHAT IT IS THAT YOU ARE RELYING UPON

24  UNLESS YOU WANT ME TO TAKE A RECESS AND READ THIS FAIRLY

25  LENGTHY COMPLAINT.  I THINK IT WOULD BE BETTER TO HAVE YOUR

1  AGENT, YOU KNOW, TELL ME.

2          DO WE NEED ANYMORE THE INTERPRETERS FOR ANYBODY HERE?

3          MR. NATALE:  NO, WE DO NOT.  HE IS FLUENT IN ENGLISH.

4          THE COURT:  YOU ARE FREE TO GO.

5          THE INTERPRETER:  I WILL SEE YOU.  GREAT.

6          THE COURT:  I KNOW.  HAND SIGNALS LIKE THIS, RIGHT?

7          THE INTERPRETER:  YES, MA'AM.

8          THE COURT:  THAT HAND SIGNAL.

9          OKAY.  IS THERE A STATUTORY PRESUMPTION?

10          MR. ANTON:  NO, YOUR HONOR.

11          THE COURT:  OKAY.  SO YOU CAN EITHER PROCEED BY

12  PROFFER OR CALL YOUR AGENT ON DIRECT, EITHER ONE.

13          MR. ANTON:  JUDGE, I WILL BE PROCEEDING BY PROFFER,

14  AND THEN OF COURSE THE AGENT WILL BE AVAILABLE FOR

15  CROSS-EXAMINATION.

16          JUST SO THE RECORD IS CLEAR, THE PROFFER WILL TRACK

17  THE LANGUAGE OF THE PROBABLE CAUSE AFFIDAVIT AS SIGNED BY

18  MAGISTRATE GOODMAN.  MAYBE I GUESS WE CAN ALL KIND OF FOLLOW

19  ALONG TOGETHER IF THAT'S OKAY WITH THE COURT?

20          THE COURT:  I AM NOT THAT GOOD.  I AM GOING TO TAKE

21  NOTES UNLESS YOU'RE TELLING ME YOU'RE JUST GOING TO KIND OF

22  READ --

23          MR. ANTON:  YES, JUDGE, THAT WAS THE ANTICIPATED PLAN.

24          THE COURT:  YOU ARE GOING TO READ --

25          MR. ANTON:  FOR EXPEDIENCY PURPOSES.

1           I CAN CERTAINLY BRIEFLY SUMMARIZE IT, BUT I DO BELIEVE

2   THE FACTS AS CONTAINED IN THE AFFIDAVIT ARE INFLUENT TO THIS

3   HEARING TODAY.

4           THE COURT:  I'M SURE THEY'RE IMPORTANT.  I MEAN, WOULD

5   YOU ALL LIKE ME TO TAKE A RECESS AND GO READ THE COMPLAINT?

6           MR. ANTON:  I THINK THAT WOULD MAKE IT EASIER.

7           MR. NATALE:  YOUR HONOR, I HAVE NO OBJECTION TO YOU

8   DOING THAT.

9           THE COURT:  I WILL READ THE COMPLAINT AND THEN YOU CAN

10  CROSS-EXAMINE THE AGENT BASED ON HIS COMPLAINT.  HOW IS THAT?

11          MR. ANTON:  PERFECT, JUDGE.

12          MR. NATALE:  THANK YOU, YOUR HONOR.

13          THE COURT:  OKAY.  ALL RIGHT.

14          [WHEREUPON, THERE WAS A BRIEF RECESS]

15          THE COURT:  THANK YOU.

16          ALL RIGHT.  SO WE'RE BACK ON THE RECORD WITH 15-2444,

17  MIGUEL MORAN DIAZ.

18          I HAVE READ THE COMPLAINT.  NOBODY EVER SAID I WAS A

19  FAST READER.  I'M NOT, BUT I READ IT CAREFULLY.

20          SO, MR. NATALE, WOULD YOU LIKE TO CROSS-EXAMINE --

21          MR. NATALE:  YES, I WOULD.

22          THE COURT:  -- THE AFFIANT?

23          OKAY.

24          MR. ANTON:  JUDGE, BEFORE WE PROCEED TO THAT I DO HAVE

25  THREE QUICK ADDITIONAL POINTS THAT I WOULD LIKE TO ADD --

1    THE COURT:  OKAY.

2    MR. ANTON:  -- IN TERMS OF A PROFFER.

3    THE COURT:  OKAY.

4    MR. ANTON:  THE FIRST BEING THAT ON FEBRUARY 8TH OF

5    2015, THERE WAS AN UNDERCOVER RECORDING BETWEEN THE

6    CONFIDENTIAL SOURCE AND THE DEFENDANT.

7    IN TERMS OF A BACKGROUND FOR THIS RECORDING THEY WERE

8    DISCUSSING GOING TO THE HOMELAND SECURITY OFFICE IN MIRAMAR,

9    FLORIDA, BECAUSE THE DEFENDANT IS UNDER SUPERVISION.  HE IS A

10   CUBAN NATIONAL.  HE DOES NOT HAVE PER SE LEGAL STATUS HERE IN

11   THE UNITED STATES SO HE IS REQUIRED TO CHECK IN.  THEY WERE

12   DISCUSSING HIS UPCOMING APPOINTMENT THAT WAS SCHEDULED FOR

13   FEBRUARY 11TH.

14   ON THIS UNDERCOVER RECORDING THE SOURCE WAS OVERHEARD

15   DISCUSSING CERTAIN THINGS WITH THE DEFENDANT IN WHICH THE

16   DEFENDANT SAID, YOU KNOW, THAT'S WHY IF SOMETHING HAPPENED TO

17   ME AND I GET ARRESTED I WOULD NEVER GO BACK TO I -- I DON'T

18   PRESENT MYSELF -- AND I APOLOGIZE -- FUCK THAT.  YOU KNOW, I

19   DON'T GO.  SO WHAT?  TO GET -- TO GET DETAINED HERE?  FUCK

20   THAT.  YOU GOT TO COME AND GET ME.

21   THEN TWO DAYS LATER -- THREE DAYS LATER SINCE HE DID

22   NOT HAVE ANY ARREST AT THE TIME BECAUSE HE HAD NOT BEEN

23   ARRESTED IN THIS CASE YET HE GOES TO THIS BUILDING IN MIRAMAR

24   AND FBI AGENTS CONDUCT SURVEILLANCE OF THE DEFENDANT CONDUCTING

25   SURVEILLANCE IN TERMS OF HIS --

1    THE COURT:  TWO OR THREE DAYS AFTER FEBRUARY 8TH, IS

2  THAT WHAT YOU'RE SAYING?

3    MR. ANTON:  YES.  ON FEBRUARY 11TH HE DOES REPORT TO

4  THE BUILDING IN MIRAMAR, THE HSI BUILDING IN MIRAMAR.  THAT WAS

5  AT THE TIME HIS INTENDED TARGET.  AND THE --

6    THE COURT:  INTENDED TARGET?

7    MR. ANTON:  OF POTENTIAL VIOLENCE.

8    THE FBI AGENTS CONDUCT SURVEILLANCE OF THE DEFENDANT.

9  THEY OBSERVE HIM CONDUCTING SURVEILLANCE OF THE HSI BUILDING,

10  TAKING PICTURES OF WHERE GUARDS ARE LOCATED, SECURITY MEASURE

11  THAT ARE IN PLACE, AND FBI AGENTS ACTUALLY WATCH HIM CONDUCT

12  SURVEILLANCE OF THAT PARTICULAR FACILITY.

13    THE COURT:  AND IN MAKING SURE I'M UNDERSTANDING THE

14  PROFFER, YOU'RE SAYING THAT BECAUSE OF MR. DIAZ'S -- I HAVE

15  MY -- WHAT DID I DO WITH THE PRETRIAL SERVICES REPORT?  COULD I

16  HAVE LEFT IT ON MY DESK?

17    MR. ANTON:  I HAVE AN EXTRA COPY, JUDGE.

18    THE COURT:  NO.  BUT I HAVE MINE ALL MARKED UP.  SO,

19  THANK YOU.

20    HE IS SUBJECT TO REMOVAL PROCEEDINGS WITH HOMELAND

21  SECURITY AND HAS TO CHECK IN BECAUSE OF HIS IMMIGRATION STATUS?

22    MR. ANTON:  THAT'S CORRECT, YOUR HONOR.

23    THE COURT:  SO HE HAD AN OBLIGATION, AN APPOINTMENT OR

24  AN OBLIGATION TO SHOW UP AS PART OF HIS CHECK-IN PROCESS?

25    MR. ANTON:  THAT'S CORRECT, YOUR HONOR.  YES.

```
 1            THE COURT:  THAT WAS WHAT WAS DISCUSSED ON FEBRUARY

 2   8TH WITH THE UNDERCOVER -- WITH AN INFORMANT --

 3            MR. ANTON:  THAT'S CORRECT.

 4            THE COURT:  -- THAT THE DEFENDANT WOULD BE GOING

 5   THERE.

 6            MR. ANTON:  CORRECT.

 7            THE COURT:  AND THEN YOU'RE SAYING ON FEBRUARY 11TH

 8   HE'S GOING THERE AND OBSERVED TO BE -- HE DOESN'T GO IN FOR

 9   THIS CHECK-IN?

10            MR. ANTON:  HE DOES GO IN FOR THE CHECK-IN.

11            THE COURT:  HE DOES.

12            MR. ANTON:  BUT WHILE HE'S AT THE FACILITY HE'S

13   OBSERVED BY FBI AGENTS CONDUCTING SURVEILLANCE OF THE BUILDING

14   ITSELF.

15            THE COURT:  OKAY.

16            MR. ANTON:  AND THEN FINALLY IN TERMS OF ADDITIONAL

17   FACTS TO THE PROFFER.  AT THE TIME OF THE DEFENDANT'S

18   CONFESSION HE DID ADVOCATE VIOLENCE IN HIS CONFESSION MOST

19   IMPORTANTLY TO CUBA.  BUT HE DID NONETHELESS ADVOCATE VIOLENCE,

20   AND CERTAINLY THE AGENT IS AVAILABLE HERE TO GET INTO MORE

21   FACTS AND DETAILS SURROUNDING HIS CONFESSION.

22            WITH THOSE ADDITIONAL ADD-INS THE GOVERNMENT WILL RELY

23   ON THE PROFFER FOR TODAY.

24            THE COURT:  ALL RIGHT.  ALL RIGHT, MR. NATALE.  AND WE

25   HAVE AFFIANT WHICH IS --
```

```
 1           MR. ANTON:  SPECIAL AGENT DAVID CLANCY WITH THE FBI.
 2           THE COURT:  OKAY.  COME ON UP, SIR.
 3           THE CLERK:  RAISE YOUR RIGHT HAND, SIR.
 4           (WITNESS SWORN)
 5           THE WITNESS:  I DO.
 6           THE CLERK:  PLEASE HAVE A SEAT.
 7           STATE YOUR NAME FOR THE RECORD AND SPELL YOUR NAME.
 8           THE WITNESS:  MY NAME IS DAVID CHANCY, C-H-A-N-C-Y.
 9                        DAVID CHANCY,
10  BEING DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:
11                       CROSS EXAMINATION
12  BY MR. NATALE:
13  Q.  AGENT CLANCY, WERE YOU THE LEAD INVESTIGATOR IN THIS CASE?
14  A.  I WAS, SIR.
15  Q.  AND DID YOU HAVE THE OPPORTUNITY TO LISTEN TO ALL OF THE
16  AUDIO RECORDINGS?
17  A.  YES, SIR.
18  Q.  DID YOU HAVE THE OPPORTUNITY TO ACTUALLY WATCH ALL OF THE
19  VIDEOS IN THIS CASE?
20  A.  YES, SIR.
21  Q.  AND DID YOU PROVIDE ANY RECORDING EQUIPMENT TO THE
22  CONFIDENTIAL HUMAN SOURCE SO THAT HE COULD RECORD ALL OF HIS
23  CONVERSATIONS?
24  A.  YES, SIR.
25  Q.  DO YOU HAVE ANY -- WERE YOU MAINTAINING 24 HOUR
```

1  SURVEILLANCE ON MR. DIAZ FROM JANUARY 25TH TO HIS ARREST ON

2  APRIL 2ND?

3  A.  WE MAINTAINED SURVEILLANCE THROUGHOUT THE TIME BUT IT WAS

4  NOT 24 HOURS --

5  Q.  IT WAS NOT 24.

6       DID YOU MAINTAIN 24 HOURS SURVEILLANCE ON THE

7  CONFIDENTIAL HUMAN SOURCE DURING THAT PERIOD?

8  A.  NO, SIR.

9  Q.  SO YOU HAVE NO INFORMATION THAT WOULD BE ABLE -- THAT WOULD

10  REFUTE WHETHER THESE TWO INDIVIDUALS HAD TELEPHONIC

11  CONVERSATIONS OR MEETINGS THAT WERE NOT MONITORED BY THE FBI.

12  A.  THE PHONE CONVERSATIONS WERE MONITORED --

13  Q.  BUT YOU HAVE NO INFORMATION THAT -- LET ME ASK YOU THIS,

14  THIS WAY.

15       ARE YOU SAYING THAT IT WAS IMPOSSIBLE FOR THE HUMAN

16  RESOURCE TO HAVE CONTACT EITHER DIRECT OR INDIRECT BY PHONE

17  WITH MR. DIAZ WITHOUT THE FBI KNOWING IT?

18  A.  IT COULD HAVE HAPPENED, SIR.

19  Q.  IT COULD NOT?

20  A.  IT COULD HAVE HAPPENED.

21  Q.  IT COULD HAVE HAPPENED.  OKAY.

22       NOW, WHAT I WOULD LIKE YOU TO DO IS IF -- AS I

23  UNDERSTAND THAT YOU HAVE ADOPTED THE AFFIDAVIT WHICH YOU SIGNED

24  AS A CORRECT STATEMENT.

25  A.  YES, SIR.

1  Q.  NOW, IF I UNDERSTAND THIS, ON THE FIRST MEETING WAS IN

2  JANUARY 25TH OF 2015.

3  A.  YES, SIR.

4  Q.  AND AT THAT MEETING THE IDENTITY OF MR. DIAZ WAS DETERMINED

5  AND AT THAT MEETING HE SHOWED A FIREARM, CORRECT?

6  A.  YES, SIR.

7  Q.  AND AT THAT TIME YOU WERE UNDER THE UNDERSTANDING THAT HE

8  WAS A CONVICTED FELON.

9  A.  YES, SIR.

10 Q.  AND PRIOR TO THAT WHAT DREW THE ATTENTION TO THE FBI WAS

11 THAT HE WAS RETWEETING OR RESENDING DIFFERENT ARTICLES

12 INVOLVING ISIS OR ISLAMIC MILITANTS, IS THAT CORRECT?

13 A.  THE ATTENTION TO MR. DIAZ STARTED BASED ON INFORMATION

14 PERTAINING TO ISIS, A MEDIA THAT WAS ON HIS FACEBOOK PAGE,

15 CORRECT.

16 Q.  AND THEY WERE -- DO YOU KNOW IF THEY WERE LIKE RETWEETING

17 OR PASSING IT ON OR WERE THEY, YOU KNOW, HIM SAYING AND TALKING

18 ABOUT IT?

19 A.  HE RETWEETED ARTICLES ON A TWITTER ACCOUNT AND ALSO

20 PROVIDED ARTICLES ON THE FACEBOOK PAGE.  HIS ACTUAL COMMENTS

21 WERE LIMITED.

22 Q.  OKAY.  AND WERE SOME OF THESE FROM ELI GLAZIER?

23 A.  ELI GLAZIER AND OTHER SOURCES.  SIR.

24 Q.  OKAY.  NOW, THERE WAS --

25          (BOTH TALKING AT THE SAME TIME)

1  A.  -- EMERA KAZCARE WHICH IS A MEDIA OUTLET FOR A KNOWN

2  TERRORIST ORGANIZATION.

3  Q.  NOW, HE WAS ALSO -- THERE WAS ALSO FACE TO FACE MEETING ON

4  THE 28TH, CORRECT?

5  A.  YES, SIR.

6  Q.  YOU MAY LOOK AT YOUR -- BECAUSE I'M TRYING TO GO THROUGH

7  WHAT IS YOUR COMPLAINT.  SO I'M -- ON THE 28TH THERE WAS ALSO A

8  FACE TO FACE MEETING WHERE MR. DIAZ NOT ONLY DISCUSSED FIREARMS

9  BUT FIREARMS WERE SEEN IN HIS POSSESSION.

10 A.  I WOULD HAVE TO LOOK AT THE COMPLAINT, SIR.  I DON'T HAVE

11 IT IN FRONT OF ME REGARDING--

12        MR. NATALE:  YOUR HONOR, MAY I APPROACH THE WITNESS TO

13 GIVE HIM A COPY OF THE COMPLAINT?

14        THE COURT:  YES.

15        THE WITNESS:  IT SAYS THAT ON THE 28TH SURVEILLANCE

16 WAS CONDUCTED.  ON JANUARY 30TH THERE WAS A MEETING WITH THE

17 CHS.

18 BY MR. NATALE:

19 Q.  AND ON THE -- WITH THE CHS ON THE 30TH AGAIN MR. DIAZ WAS

20 IN POSSESSION OF FIREARMS?

21 A.  I HAVE -- I CAN'T SPEAK TO WHETHER OR NOT HE HAD A FIREARM,

22 SIR.

23 Q.  IS THERE ANYTHING IN THE COMPLAINT WHICH WOULD INDICATE

24 THAT HE SHOWED THE CONFIDENTIAL HUMAN SOURCE THE -- A FIREARM,

25 OR PHOTOS OF FIREARMS, OR ANYTHING LIKE THAT?

1   A.  ON THAT MEETING, SIR, THAT YOU ARE REFERRING TO THERE WAS A

2   DISCUSSION OF FIREARMS.

3   Q.  OKAY.  NOW, ON --

4           THE COURT:  YOU ARE REFERRING TO THE 30TH RIGHT NOW,

5   JANUARY 30TH?

6           THE WITNESS:  YES.  JANUARY 30TH, YES.

7   BY MR. NATALE:

8   Q.  AND WERE YOU AWARE OF WHETHER THERE WAS ANY VIEWING OF ANY

9   FIREARMS THAT WERE ACTUALLY IN MR. DIAZ'S POSSESSION?

10  A.  NOT THAT I CAN RECALL, SIR, NO.

11  Q.  LET'S NOW TURN TO FEBRUARY 5TH, THE MEETING OF FEBRUARY

12  5TH.  WAS HE ACTUALLY IN POSSESSION OF FIREARMS AT THAT TIME?

13  A.  ON THE FEBRUARY 5TH MEETING?  YES, SIR.

14  Q.  ON FEBRUARY 8TH HE WAS ALSO IN POSSESSION OF FIREARMS, IS

15  THAT CORRECT?

16  A.  YES, SIR.

17  Q.  THERE WAS -- AND I DON'T HAVE IT IN FRONT OF ME.  BUT THERE

18  WAS ALSO A TIME WHERE HE WENT OUT SHOOTING IN THE EVERGLADES

19  WITH THE CONFIDENTIAL HUMAN SOURCE, AND IT WAS MONITORED BY THE

20  FBI VIA HELICOPTER AND OTHER MEANS, IS THAT CORRECT?

21  A.  HELICOPTER IS NOT CORRECT, SIR.  BUT THERE WAS --

22  Q.  WAS THERE ANY AERIAL SURVEILLANCE?

23  A.  YES, SIR.

24  Q.  OKAY.  I'M SORRY.  OKAY.  IT WAS --

25  A.  JUST TRYING TO BE --

 1  Q.  OKAY.  SOME AERIAL MECHANISM THAT COULD FLY.

 2  A.  YES, SIR.

 3  Q.  AND AS IT WAS FLYING IT WAS ABLE TO OBSERVE THIS.

 4  A.  YES, SIR.

 5  Q.  AND YOU WERE ABLE TO MONITOR LIVE WHAT WAS GOING ON.

 6  A.  YES, SIR.

 7  Q.  I MEAN, CURRENTLY WHAT WAS GOING ON.

 8  A.  I WAS THERE, SIR.  I WAS NOT RECEIVING THE LIVE MONITORING.

 9  BUT AGENTS OF THE FBI, YES.

10  Q.  AND YOU HAVE SINCE OBSERVED THAT.

11  A.  THAT ACTUAL FOOTAGE?  NO, SIR.

12  Q.  DID YOU SEE HIM THERE SHOOTING GUNS?

13  A.  THERE IS -- IN A POST-ARREST STATEMENT MR. DIAZ REFERS TO A

14  VIDEO THAT WAS SHOT OF HIM DURING THAT TIME WHERE THE

15  CONFIDENTIAL HUMAN SOURCE VIDEOTAPED MR. DIAZ SHOOTING THE GUN.

16  Q.  AND HE ALSO VIDEOTAPED THE CONFIDENTIAL SOURCE SHOOTING

17  FIREARMS, RIGHT?

18  A.  THAT'S WHAT MR. -- YES, SIR.  YES, SIR.  THAT'S WHAT

19  MR. DIAZ STATED.

20  Q.  OKAY.  WELL, DO YOU HAVE -- DID YOU EVER CONFIRM THAT

21  WHETHER THOSE VIDEOS WERE ACTUALLY TAKEN?

22  A.  MR. DIAZ SAID THAT THEY WERE TAKEN AND THEY ARE ON HIS

23  PHONE.

24  Q.  OKAY.  WHAT ABOUT THE CONFIDENTIAL HUMAN SOURCE.

25  A.  HE AGREED THAT THOSE -- HE ALSO SAID THAT THOSE VIDEOS WERE

 1  TAKEN.

 2  Q.  NOW, THIS IS IN -- WE ARE STILL NOW IN FEBRUARY, IS THAT

 3  CORRECT?

 4  A.  YES, SIR.

 5  Q.  NOW, LET'S MOVE ON TO MARCH 1ST.  THERE WAS ANOTHER

 6  MEETING, IS THAT CORRECT?

 7  A.  YES.

 8  Q.  AND WEAPONS WERE ALSO SHOWN BY MR. DIAZ AT THAT TIME.

 9  A.  NO, SIR.

10  Q.  NO WEAPONS AT THAT TIME?

11  A.  NOT THAT -- HE MADE REFERENCES TO HAVING WEAPONS IN HIS

12  RESIDENCE.

13  Q.  NOW, IT WAS MENTIONED THAT HE HAD TO REPORT, AND THAT HE

14  WENT TO THE HOMELAND SECURITY OFFICE IN ORDER TO REPORT AND HE

15  ACTUALLY DID REPORT AS HE IS SUPPOSED TO, RIGHT?

16  A.  YES, SIR.

17  Q.  AND DO YOU HAVE SURVEILLANCE VIDEO OF HIM TAKING

18  PHOTOGRAPHS AND DOING THESE THINGS?

19  A.  WE HAVE PHOTOGRAPHS OF HIM TAKING THOSE PHOTOGRAPHS.  WE

20  ALSO HAVE HIS STATEMENT CONFIRMING IN THE POST-ARREST THAT HE

21  IN FACT TOOK PHOTOGRAPHS AND CONDUCTED SURVEILLANCE OF THAT

22  FACILITY.

23  Q.  AND THAT WAS AS A CONSEQUENCE OF THE DISCUSSIONS HE HAD

24  WITH THE CONFIDENTIAL SOURCE, THE HUMAN SOURCE.

25  A.  THE MOTIVATION FOR THOSE PHOTOGRAPHS, SIR, I THINK MR. DIAZ

 1  WOULD HAVE TO SPEAK TO EXACTLY WHY HE TOOK THOSE.

 2         IN THE POST-ARREST STATEMENT HE GAVE US VARIOUS

 3  ACCOUNTS AS TO WHY HE TOOK THOSE PHOTOS.

 4  Q.  WELL, LET ME ASK YOU THIS.

 5         ARE YOU AWARE BASED ON LISTENING TO ALL OF THE

 6  RECORDINGS THAT THE CONFIDENTIAL SOURCE, HUMAN SOURCE,

 7  DISCUSSED WITH HIM TAKING PHOTOGRAPHS AND THEN SHOWING THE

 8  PHOTOGRAPHS TO THE CONFIDENTIAL HUMAN SOURCE TO PROVE TO THE

 9  SOURCE THAT HE IN FACT DID THESE THINGS, RIGHT?

10  A.  YES, SIR.

11  Q.  BUT ISN'T IT TRUE THAT HE NEVER SHOWED THE PHOTOGRAPHS TO

12  THE CONFIDENTIAL SOURCE.

13  A.  TO MY KNOWLEDGE THAT IS CORRECT, SIR.

14  Q.  HE NEVER SHOWED IT.  HE NEVER FULFILLED THAT.

15         AND WHILE WE'RE TALKING ABOUT THAT.  ISN'T IT TRUE

16  THAT THE CONFIDENTIAL HUMAN SOURCE, ONE OF THE THINGS THEY'RE

17  TRYING TO DO IS TO SEAL OUT, FOR LACK OF A BETTER TERM, AN

18  INDIVIDUAL TO SEE IF THEY'RE SERIOUS, IS THAT CORRECT?

19  A.  I THINK THAT'S -- IN AN INVESTIGATION LIKE THIS, SIR, THAT

20  IS SOMETHING THAT OUR ORGANIZATION ABSOLUTELY WANTS TO

21  DETERMINE.

22  Q.  AND SO, THEREFORE, THERE IS CONVERSATION THAT CAN BE

23  SUGGESTED.  ARE YOU INTERESTED IN THIS?  ARE YOU INTERESTED IN

24  THAT?  BECAUSE IN ORDER TO SEE IF SOMEONE IS REALLY SERIOUS

25  THAT'S THE SORT OF STUFF YOU NEED TO KNOW.

A.   I THINK, SIR, THE CONVERSATIONS WITH THE HUMAN SOURCE IN

THE INITIAL MEETINGS WHEN MR. DIAZ REFERRED TO HIM -- REFERRED

HIM TO AL-QAEDA AND THE ARABIAN PENINSULA'S INSPIRE MAGAZINE

AND INSTRUCTED HIM AND PROVIDED -- HELP PROVIDE INSTRUCTION TO

HIM ON HOW TO CONSTRUCT BOMBS REFERRED THE CONFIDENTIAL HUMAN

SOURCE TO AL-QAEDA AND THE ARABIAN PENINSULA'S FORMER LEADER,

ANWAR AL-AWLAKI, AND INSTRUCTED THE CONFIDENTIAL HUMAN SOURCE

TO START TO LISTEN TO THOSE VIDEOS, AND TO LISTEN TO THAT

MESSAGE WHICH ADVOCATES VIOLENCE AND ATTACKS HERE IN THE WEST.

ONCE HE INITIATED AND PROVIDED THAT INFORMATION THEN

ABSOLUTELY WE WANTED THE SOURCE TO SEE HOW SERIOUS OF A THREAT

HE WAS AND WHETHER OR NOT HE INTENDED TO DO AN ATTACK HERE IN

THE UNITED STATES.

Q.   EXACTLY.  AND SO NOW THE SOURCE IS TRYING TO ENGAGE HIM IN

CONVERSATION AND ACTIVITIES TO DETERMINE HOW SERIOUS HE IS.

A.   CORRECT, SIR.

Q.   AND ISN'T IT TRUE THAT AFTER YOU SPOKE TO MR. DIAZ HE

INFORMED YOU THAT HE WAS TESTING OUT THIS INDIVIDUAL TO SEE HOW

SERIOUS HE WAS.

A.   HE STATED THAT, SIR, IN HIS POST-ARREST THAT HE WAS AT

TIMES TESTING THE SOURCE TO SEE HOW FAR HE WOULD GO.

Q.   AND, IN FACT, IT WENT SO FAR AS THE SOURCE ACTUALLY

TRAVELING TO CHICAGO AND MEETING WITH INDIVIDUALS IN CHICAGO.

A.   THE --

Q.   THE CONFIDENTIAL SOURCE.

 1 A.  THE TRAVEL DID OCCUR TO CHICAGO.  YES, SIR.

 2 Q.  HE WENT THERE.  AND WHEN HE WENT THERE IT WAS TO MEET A

 3 GROUP THAT IS -- ESPOUSES AND TRIES TO PROMOTES NONVIOLENT

 4 ACTIVITIES, ISN'T IT TRUE?

 5 A.  SIR, MR. DIAZ INSTRUCTED THE SOURCE TO TRAVEL ON HIS

 6 BEHALF -- ON HIS BEHEST TO -- IT WAS ACTUALLY DETROIT.  AND THE

 7 ORGANIZATION THAT MR. DIAZ KNEW THAT THOSE INDIVIDUALS WERE

 8 PART OF IS AN ORGANIZATION CALLED HIZBUT TAHRIR.

 9 Q.  EXACTLY.

10 A.  AND THAT ORGANIZATION IS BAND IN SOME COUNTRIES, IT IS

11 UNDER SCRUTINY IN OTHERS, AND THEY ADVOCATE THE ESTABLISHMENT

12 OF A GLOBAL CALIPHATE, THE ESTABLISHMENT OF GLOBAL ISLAMIC RULE

13 THROUGHOUT THE WORLD.

14         NOW, THERE --

15 Q.  LET ME ASK YOU THIS --

16         (BOTH TALKING AT THE SAME TIME)

17 A.  -- PRESS RELEASE HERE IN THE UNITED STATES SAY THAT THEY

18 ADVOCATE THAT AND -- BY POLITICAL MEANS.

19 Q.  SO HERE IN THE UNITED STATES THEY ADVOCATE THAT BY

20 POLITICAL MEANS.

21         NOW, I NOTICE THAT YOU WERE CAREFUL IN CHOOSING YOUR

22 WORDS.  ARE YOU TELLING THIS JUDGE THAT THIS ORGANIZATION IS --

23 HAS BEEN IDENTIFIED AS A TERRORIST ORGANIZATION THAT IS

24 OPERATING IN THE UNITED STATES?

25 A.  NO, SIR, NOT OPERATING IN THE UNITED STATES.

1    Q.  AND, IN FACT, ISN'T IT TRUE THAT YOU AND OTHER MEMBERS OF

2    THE FBI FOR A LONG TIME HAVE KNOWN OF THIS ORGANIZATION.

3              THE COURT:  YOU'RE TALKING ABOUT THE DETROIT

4    ORGANIZATION?

5              MR. NATALE:  THE DETROIT ORGANIZATION.

6              THE COURT:  AH-HUH.

7              THE WITNESS:  HE IS REFERRING TO HIZBUT TAHRIR, MA'AM.

8    BY MR. NATALE:

9    Q.  HIZBUT TAHRIR, IS THAT CORRECT, SIR?

10   A.  YES, SIR.

11   Q.  AND TO YOUR KNOWLEDGE DO YOU HAVE ANY REASON TO BELIEVE

12   THAT WHEN THE CONFIDENTIAL SOURCE WENT THERE, THERE WAS ANY

13   TALK ABOUT COMMITTING ANY VIOLENT CRIMES?

14   A.  SIR, I DON'T -- YOU WANT ME TO SPEAK TO --

15   Q.  LET ME ASK YOU THIS.

16   A.   -- THE CONVERSATIONS THE SOURCE HAD WITH OTHER

17   INDIVIDUALS?

18             MR. ANTON:  JUDGE, I AM GOING TO OBJECT TO RELEVANCE.

19   I'M NOT SURE WHAT THE RELEVANCE OF A SOURCE'S CONVERSATION ON A

20   FOLLOW-UP INVESTIGATION IN DETROIT HAS TO DO WITH THE DEFENDANT

21   POSSESSING FIREARMS HERE IN SOUTH FLORIDA AND BEING A POTENTIAL

22   DANGER TO THE COMMUNITY.

23             MR. NATALE:  YOUR HONOR, HERE IS RELEVANCE.

24             THEY WANT TO SAY THAT HE IS A DANGER TO THE COMMUNITY.

25   THEY COULD HAVE FILED THIS CASE AS SAYING, HEY, WE FOUND HIM

1 WITH -- WE FOUND HIM WITH GUNS.  HE HAD GUNS AND HE'S A FELON,

2 LIKE 99.9 PERCENT OF THE CASES YOU SEE.

3 THEY DECIDED TO WRITE A LENGTHY COMPLAINT PAINTING A

4 PARTICULAR PICTURE.  MY VIEW IS THAT THE DANGER TO THE

5 COMMUNITY IS PREDICATED ON ALL OF THE OTHER STUFF THAT THEY PUT

6 IN THERE.

7 I THINK IT'S RELEVANT TO SHOW -- AND I THINK WHEN I

8 FINISH THE CROSS-EXAMINATION WHAT YOU ARE GOING TO REALIZE IS

9 THEY HAVEN'T CHARGED HIM WITH AIDING A TERRORIST ORGANIZATION

10 OR --

11 THE COURT:  I KNOW THAT.

12 MR. NATALE:  WELL, I KNOW YOU KNOW THAT.  BUT IT'S

13 IMPORTANT BECAUSE THEY ARE BRINGING ALL OF THIS STUFF OUT.

14 I THINK THAT IT IS RELEVANT TO SHOW WHETHER HE IS A

15 DANGER TO THE COMMUNITY BECAUSE IT IS MY UNDERSTANDING THAT HE

16 EXPRESSLY TOLD THE CONFIDENTIAL SOURCE THAT HE DIDN'T WANT TO

17 AND WOULD NOT WANT TO ENGAGE IN ANY VIOLENT ACTIVITY IN THE

18 UNITED STATES.

19 THE COURT:  I THINK THAT'S RELEVANT.  SO THAT YOU

20 COULD INQUIRE ABOUT.  BUT, YOU KNOW, YOU HAVE THE ALLEGATIONS

21 OF WHAT YOUR CLIENT DID SAY THAT ARE IN THE AFFIDAVIT THAT

22 SUGGESTS HIS PROPENSITY TO VIOLENCE.

23 IF IN FACT THE INFORMANT MET WITH A GROUP THAT ISN'T

24 SO FOCUSED ON VIOLENCE BUT POLITICAL MEANS DOESN'T REALLY

25 NEGATE WHAT IS IN THIS AFFIDAVIT AND I THINK IT SEEMS LIKE A

 1 TANGENT.

 2         MR. NATALE:  BUT I THINK THAT -- YOUR HONOR, BECAUSE

 3 NOW HE COMES BACK.  AND WHEN HE COMES BACK HE AGAIN MEETS WITH

 4 MY CLIENT AND THERE IS NO TALK ABOUT HIM DOING ANYTHING VIOLENT

 5 AT ALL.  I THINK THAT DOES GO TO THE DANGER TO THE COMMUNITY

 6 ASPECT.

 7 BY MR. NATALE:

 8 Q.  BUT LET ME ASK YOU THIS.

 9         ISN'T IT TRUE THAT MR. DIAZ EXPRESSED IN THESE

10 RECORDINGS TO THE CONFIDENTIAL SOURCE THAT HE DID NOT WANT

11 TO, NOR WOULD HE ENGAGE IN ANY VIOLENT ACTIVITIES HERE IN THE

12 UNITED STATES?

13 A.  MR. DIAZ DID -- AND I THINK YOU'RE SPEAKING TO POST THE

14 DETROIT TRIP, DID SAY THAT HE WANTED TO FOCUS ON CUBA.  HIS

15 FOCUS HAD SHIFTED TO CUBA AND THINGS THAT WERE HAPPENING THERE

16 AS OPPOSED TO DOING SOMETHING HERE IN THE UNITED STATES.

17 Q.  EXACTLY.  SO HE THEN SAID THAT HE HAD FRIENDS OR PEOPLE IN

18 CUBA AND THAT WHAT HE WANTED TO DO WAS ACTUALLY TO TRY TO GET

19 THE CONFIDENTIAL SOURCE TO GO TO CUBA AND TO WORK WITH THOSE

20 PEOPLE.

21 A.  HE EXPRESSED THAT TO THE SOURCE, YES, SIR.

22 Q.  AND THAT THERE WAS NOTHING FURTHER OF HIM EVER SAYING

23 ANYTHING ABOUT DOING ANY VIOLENCE HERE IN THE UNITED STATES, IS

24 THAT CORRECT?

25 A.  NOTHING FURTHER FROM --

1  Q.  MR. DIAZ ABOUT DOING ANY VIOLENCE, DOING SURVEILLANCE, OR

2  ANYTHING IN THE UNITED STATES.

3  A.  ONCE -- AFTER THE RETURN TRIP FROM DETROIT THE FOCUS OF

4  MR. DIAZ WAS TO CUBA.  I CAN'T SPEAK TO IF THERE WAS EVER A

5  MENTION ON ANY OF THOSE TAPES OF DOING ANYTHING FURTHER

6  VIOLENT.  BUT IT WAS CLEAR HE WAS SHIFTING HIS FOCUS TO CUBA.

7  Q.  NOW, THERE WAS -- DURING THIS ENTIRE TIME FROM JANUARY 25TH

8  UP AND TO HIS ARREST ON APRIL 2ND HE WAS ALLOWED TO FREELY GO

9  AND DO WHATEVER HE WANTED WHEREVER HE WANTED, IS THAT CORRECT?

10  A.  THE FBI CONDUCTED SURVEILLANCE THROUGHOUT THAT TIME, SIR.

11  Q.  BUT REALISTICALLY IT WASN'T 24 HOURS.  HE WAS FREE TO COME

12  AND GO AND DO WHAT HE WANTED TO DO.

13  A.  YES, SIR.

14  Q.  OKAY.  NOW, AS FAR AS A RISK OF FLIGHT.

15      DO YOU KNOW IF THE CUBAN AUTHORITIES HAVE BEEN

16  INFORMED ABOUT HIS INTENTIONS TO HAVE A CALIPHATE OR AN ISLAMIC

17  GROUP IN CUBA?

18  A.  NO, SIR.

19  Q.  OKAY.  DO YOU HAVE ANY REASON -- SO YOU HAVE NO KNOWLEDGE

20  OF THAT.

21  A.  OF THE CUBAN AUTHORITIES HAVING KNOWLEDGE OF MR. DIAZ, SIR?

22  NO, SIR, I DO NOT HAVE ANY KNOWLEDGE OF THAT.

23  Q.  OKAY.  ARE YOU AWARE THAT THERE HAS BEEN, ACCORDING TO THE

24  GOVERNMENT, A HOLD ON AN -- AN INS HOLD ON HIM FOR POSSIBLE

25  DEPORTATION TO CUBA?

1  A.  YES, SIR.  THERE IS A HOLD ON MR. DIAZ.

2  Q.  AND THAT HOLD WOULD BE FOR POSSIBLE DEPORTATION TO WHERE?

3  A.  OH, YES.  YES, SIR, TO CUBA.

4  Q.  TO CUBA.

5  A.  CURRENTLY AS YOU KNOW THERE IS NO DEPORTATIONS TO CUBA AS

6  THE COUNTRIES NORMALIZE RELATIONSHIPS.

7  Q.  BUT THINGS ARE CHANGING.

8  A.  YES, SIR.

9  Q.  OKAY.  NOW, DO YOU HAVE ANY INDICATION THAT HE WOULD EVEN

10  WANT TO LEAVE THE UNITED STATES TO GO TO CUBA?

11  A.  ON HIS POST-ARREST STATEMENT, SIR, MR. DIAZ TALKED ABOUT

12  HIS GOAL OF RETURNING TO CUBA, AND THAT BEING A LIFELONG GOAL.

13  AND THE FACT THAT HE WOULD EVENTUALLY WANT TO ESTABLISH RULE IN

14  CUBA AND BE A LEADER OF CUBA.

15       AND HE MENTIONED THAT HIS EXPLOSIVE RESEARCH IN

16  INSPIRED MAGAZINE WAS BASED ON THE FACT THAT HE WASN'T GOING TO

17  DO SOMETHING HERE BUT HE NEEDED TO DO THAT RESEARCH TO

18  EVENTUALLY POSSIBLY DO ATTACKS IN CUBA.  HE TALKED ABOUT THE

19  POTENTIAL TO BLOW UP A GOVERNMENT BUILDING IN CUBA.

20  Q.  AND THAT IS THE -- THAT IS NOT AN UNCOMMON THING FOR MANY

21  PEOPLE TO TALK ABOUT IN MIAMI, IS IT?

22  A.  I CAN'T SPEAK TO THAT, SIR.

23  Q.  WELL, LET ME ASK YOU THIS.

24       ISN'T IT TRUE THAT HE TOLD YOU THAT IF HE EVER WENT TO

25  CUBA HE COULD NEVER COME BACK BECAUSE HE WAS UNDER A

```
 1   DEPORTATION ORDER?

 2         IN HIS CONFESSION TO YOU DIDN'T HE EVEN SAY THE REASON

 3   WHY HE NEEDED THIS CONFIDENTIAL SOURCE TO GO IS BECAUSE IF HE

 4   EVER WENT HE COULD NEVER COME BACK TO THE UNITED STATES.

 5   A.   HE TALKED ABOUT HIS INABILITY TO TRAVEL AND THE FACT THAT

 6   HE DIDN'T HAVE A PASSPORT AND HE COULDN'T TRAVEL.

 7   Q.   OKAY.

 8         MR. NATALE:  YOUR HONOR, I HAVE NO FURTHER QUESTIONS.

 9         THE COURT:  ALL RIGHT.

10         ANY REDIRECT?

11         MR. ANTON:  NO, YOUR HONOR, JUST ARGUMENT.

12         THE COURT:  ALL RIGHT, SIR.  THANK YOU.

13         YOU ARE WELCOME TO STEP DOWN.

14         MR. NATALE:  YOUR HONOR, MAY I MAKE A BRIEF PROFFER?

15         THE COURT:  SURE.

16         MR. NATALE:  YOUR HONOR, HE HAS BEEN LIVING WITH THE

17   SAME PERSON FOR APPROXIMATELY SIX YEARS, AND THAT THE ADDRESS

18   WHICH IS ON THE PRETRIAL -- EXCUSE ME, PRETRIAL RELEASE FORM --

19         THE COURT:  PRESENTENCE INVESTIGATION.

20         MR. NATALE:  PRESENTENCE INVESTIGATION --

21         THE COURT:  YES.

22         MR. NATALE:  -- SORT OF SPECIFIES ALL OF THAT.

23         I HAVE HAD A CONVERSATION --

24         THE COURT:  HE IS STILL LIVING AT THAT ADDRESS.

25         MR. NATALE:  YES.
```

```
 1            THE COURT:  IT'S ON --

 2            (BOTH TALKING AT THE SAME TIME)

 3            MR. NATALE:  YES, HE IS LIVING --

 4            THE COURT:  -- THE PRETRAIL SERVICES REPORT.

 5            MR. NATALE:  -- AT THAT ADDRESS, AND WE COULD HAVE

 6   INSTALLED A -- A LANDLINE THERE SO HE COULD BE UNDER THE

 7   COMPLETE AND TOTAL CONFINEMENT.

 8            HE SUCCESSFULLY COMPLETED SUPERVISED RELEASE IN 2011.

 9   FROM 2011 TO THE PRESENT THERE HAS BEEN NO CRIMINAL ACTIVITY AT

10   ALL WITH THIS INDIVIDUAL.

11            THE COURT:  EXCEPT FOR WHAT'S ALLEGED HERE.

12            MR. NATALE:  WELL, EXCEPT FOR WHAT'S ALLEGED HERE.

13            THE COURT:  RIGHT.

14            MR. NATALE:  BUT, YOUR HONOR, AS YOU KNOW EVERYONE

15   WANTS TO GO TO BACK TO -- WHEN THEY WERE 14, 15 AND SAY, WELL,

16   THAT'S PART OF THEIR PAST.  I THINK WE NEED TO LOOK AT HIS

17   PRESENT.

18            THE COURT:  AH-HUH.

19            MR. NATALE:  THAT IN HIS PRESENT THERE IS NOTHING.

20            I THINK THAT THE -- THE OTHER -- AS I LOOK AT THE

21   GUIDELINE RANGE, EVEN CALCULATING IT HIGH WITH THE ACCEPTANCE

22   OF RESPONSIBILITY HE COMES TO ROUGHLY 63 TO 78 MONTHS.  AND

23   THAT IS NOT A SUBSTANTIAL AMOUNT OF TIME THAT WOULD CAUSE

24   SOMEBODY WHO HAS ALREADY SERVED PRISON TIME IN THE FEDERAL

25   SYSTEM.  AND I THINK THE LAST INFORMATION WE RECEIVED IS THAT
```

1  HE HAS NO TRAVEL DOCUMENTS AND THAT GIVEN THE FACTS OF THIS

2  CASE CUBA IS PROBABLY THE LAST PLACE THAT HE WOULD WANT TO FLEE

3  TO.

4          YOU ALSO KNOW THAT HE REGULARLY REPORTS AS HE IS

5  SUPPOSED TO BY IMMIGRATION.  SO I DON'T SEE THAT THERE IS A

6  RISK OF FLIGHT WITH THIS PARTICULAR INDIVIDUAL.

7          NOW, WE TALK ABOUT DANGER TO THE COMMUNITY.  YOU KNOW,

8  ACTION SPEAKS LOUDER THAN WORDS.  WE HAVE APPROXIMATELY 59 TO

9  60 DAYS WHERE THE FBI ALLOWED THIS MAN WHO THEY KNEW HAD ALL OF

10 THESE WEAPONS TO WALK AROUND AND DO WHATEVER HE WANTED KNOWING

11 THAT HE HAD THOSE WEAPONS.

12         THEY WENT, THEY SAW EVERYTHING, 59 DAYS AND HE WASN'T

13 UNDER 24 HOURS SURVEILLANCE.  WE DON'T EVEN KNOW THE EXTENT OF

14 THE SURVEILLANCE.  WE DON'T KNOW WHETHER OR NOT THERE WAS OTHER

15 MEETINGS WITH THE CONFIDENTIAL SOURCE AND THE LIKE.

16         BUT HOW CAN SOMEONE BE A TRUE DANGER TO THE COMMUNITY

17 WHEN THEY HAVE SAID THEY DON'T WANT TO DO ANY VIOLENCE HERE IN

18 THE UNITED STATES AND THEY OBVIOUSLY FELT COMFORTABLE ENOUGH

19 WITH HIM NOT TO ARREST HIM AFTER 10 DAYS, AFTER FIVE DAYS,

20 AFTER THREE MEETINGS.

21         I SUGGEST TO YOU, YOUR HONOR, THE REASON IS THEY WERE

22 TRYING TO CONTINUE TO PUSH HIM TO DO SOMETHING MORE WHICH HE

23 CONTINUALLY REJECTED.

24         THE REASON WHY THE DETROIT IS IMPORTANT IS BECAUSE

25 THAT'S WHERE HE SENT THE PERSON.  AND THE PERSON THEN WENT

1 THERE AND COMES BACK.  AND WHEN THEY COME BACK NOW -- WE ARE

2 NOW TALKING ABOUT CUBA AND THE LIKE.  THERE IS NO LONGER

3 ANYTHING.  AND IT WAS ONLY AT THAT POINT -- AND I SUGGEST IT'S

4 WHEN THEY REALIZED THAT HE WAS NOT A DANGER TO THE UNITED

5 STATES, THAT HE WASN'T GOING AGREE WITH ANY PLAN TO HURT ANYONE

6 IN THE UNITED STATES, THAT THEY SAY, WELL, LOOK, AT LEAST HE'S

7 A CONVICTED FELON.  WE CAN ARREST HIM ON THAT.  AND THAT'S WHAT

8 HAPPENED.

9       SO I DO NOT THINK THAT THESE FACTS SHOW THAT THIS

10 PERSON IS ACTUALLY A DANGER TO THE COMMUNITY OR THAT HE IS A

11 RISK OF FLIGHT BASED ON EVERYTHING THAT WE KNOW HERE.

12       WE MAY NOT LIKE THE CONVERSATIONS THAT HE ENGAGED IN,

13 BUT THOSE ARE PROTECTED CONVERSATIONS UNDER THE FIRST

14 AMENDMENT.  AND WHEN IT CAME DOWN TO IT, WHEN ALL WAS SAID AND

15 DONE AND THEY DID EVERYTHING THEY COULD HE SAYS, NO WAY.

16 ABSOLUTELY NOT.  NO WAY.

17       THE COURT:  I DIDN'T HEAR THE NO WAY IN THE EVIDENCE.

18       MR. NATALE:  WELL, WHEN I ASKED HIM -- I SAID AT ANY

19 TIME DID HE EVER SAY THAT HE WAS WILLING TO DO ANYTHING?

20       NO.

21       DID HE EVEN SHOW THE SURVEILLANCE PHOTOGRAPHS WHICH HE

22 WAS ASKED TO DO?

23       NO.

24       HE NEVER SHOWED THE SURVEILLANCE PHOTOGRAPHS.  HE

25 NEVER SHOWED THEM TO THE CONFIDENTIAL SOURCE.

1    THE COURT:  TO THE INFORMANT.  OH, OKAY.

2    MR. NATALE:  SO WE.

3    THE COURT:  -- UNDERSTAND --

4    (BOTH TALKING AT THE SAME TIME)

5    MR. NATALE:  SO HE NEVER DID ANY AFFIRMATIVE STEP,

6 JUDGE, THAT WOULD SHOW THAT HE'S A DANGER TO THE COMMUNITY.

7    THE COURT:  AH-HUH.  OKAY.

8    MR. NATALE:  AND SO, MY FEELING IS, IS THAT WE COULD

9 PUT A HUNDRED THOUSAND DOLLAR PERSONAL SURETY BOND TO BE SIGNED

10 BY HIM AND BY HIS GIRL-FRIEND OF SIX YEARS, THAT HE WOULD THEN

11 BE UNDER 24 HOUR HOUSE ARREST WITH THE EXCEPTION OF BEING ABLE

12 TO GO TO HIS ATTORNEY, AND TO MAKE COURT APPEARANCES, AND FOR

13 RELIGIOUS SERVICES.

14    THE COURT:  AND YOU'RE PROPOSING THAT AMOUNT OF THE

15 BOND BECAUSE HE REALLY DOESN'T HAVE ASSETS TO POST SOMETHING

16 MORE SIGNIFICANT, IS THAT RIGHT?

17    MR. NATALE:  YES.  AND I THINK THAT HE DOESN'T HAVE

18 THE ASSETS FOR IT.  HE HAS THE PUBLIC DEFENDER.  AND THERE

19 IS -- WHERE IS HE GOING TO GO?  HE HAS HE'S GOT NOWHERE TO GO.

20    THE COURT:  OKAY.  I UNDERSTAND YOUR ARGUMENT.

21    THE GOVERNMENT?

22    MR. ANTON:  JUDGE, THE GOVERNMENT FEELS THAT THIS

23 DEFENDANT IS --

24    THE COURT:  COULD YOU GET A LITTLE CLOSER TO THE

25 MICROPHONE?

1          MR. ANTON:  SURE.

2          THE GOVERNMENT DOES FEEL THAT THIS DEFENDANT IS A

3  DANGER TO THE COMMUNITY.

4          WE WOULD FIRST POINT OUT, OF COURSE, HIS VIOLENT

5  BELIEFS AS EVIDENCED BY HIS FACEBOOK POSTS REGARDING ISIS.

6  THAT HE WANTED TO PURCHASE ADDITIONAL FIREARMS FROM THE

7  CONFIDENTIAL SOURCE INCLUDING AN ADDITIONAL BABY GLOCK AND A

8  .308 CALIBER RIFLE.  THAT HE WAS BRAGGING ABOUT HOW HIS

9  COLLAPSIBLE STOCK RIFLE WAS THE PERFECT WEAPON TO SMUGGLE INTO

10 A STADIUM UNDETECTED.

11         THE FACT THAT HE CONDUCTED ACTIVE SURVEILLANCE OF A

12 TARGETING LOCATION IN MIRAMAR, FLORIDA.  THAT HE INDICATED HIS

13 DESIRE TO BE A LOAN WOLF FOR ISIS, THAT HE ADVOCATED THE

14 KILLING OF PEOPLE AND THE ASCRIBING OF ISIS INTO SHELL CASINGS.

15         THE FACT THAT HE VIEWED INSTRUCTIONS ON BOMB MAKING IN

16 INSPIRE MAGAZINE, WHICH IS AL-QUAED'S MAGAZINE.  THAT HE

17 ACTIVELY WAS OBSERVED PRACTICING, FIRING AND SHOOTING HIS

18 WEAPONS.  THAT HE WANTED TO BUY MORE AMMUNITION FROM THE

19 SOURCE.

20         AND, OF COURSE, WHAT THE DEFENSE DIDN'T MENTION THAT

21 DURING THE TAKE DOWN A LOADED FIREARM WAS FOUND IN HIS

22 WAISTBAND WITH AN ADDITIONAL MAGAZINE ALSO FOUND ON HIS

23 POSSESSION FOR A TOTAL OF 30 ROUNDS OF AMMUNITION.  THAT A

24 RIFLE WAS FOUND IN HIS APARTMENT WITH AN ADDITIONAL 297 ROUNDS

25 OF AMMUNITION, AND THAT HE PREVIOUSLY HAD THREATENED TO KILL

1   HIS GIRLFRIEND SHOULD SHE CALL 911 TO REPORT THE FIREARMS IN

2   THE HOUSE.

3        CLEARLY THIS IS NOT AN INDIVIDUAL WHO WE WOULD WANT TO

4   BE A CO-SIGNER ON A BOND.

5        AS FOR RISK OF FLIGHT?  THE DEFENDANT IS A CUBAN

6   CITIZEN.  THERE IS AN IMMIGRATION DETAINER IN PLACE.  SHOULD HE

7   BE RELEASED BY THIS COURT HE WOULD GO INTO IMMIGRATION CUSTODY

8   FOR REMOVAL PROCEEDINGS.  OF COURSE, WE CAN'T GUARANTEE THAT HE

9   WOULD BE REMOVED TO CUBA BUT HE WOULD REMAIN IN A DETENTION

10  FACILITY FOR AN UNDETERMINED PERIOD OF TIME.

11       HIS MOM AND SISTER BOTH LIVE IN CUBA.  HE HAS ADMITTED

12  THAT HE WANTS TO GO TO CUBA.  HE HAS ADVOCATED VIOLENCE IN HIS

13  CONFESSION SHOULD HE GET TO CUBA.  BUT HE'S -- HE ALSO HAS NO

14  ASSETS HERE IN THE UNITED STATES.  HE IS SELF-EMPLOYED AND

15  WORKING AS A DRIVER WITH UBER.  HE IS LIVING WITH A GIRLFRIEND

16  IN GOVERNMENT HOUSING AND HE HAS NO OTHER TIES TO THIS

17  COMMUNITY OTHER THAN THE GIRLFRIEND.

18       FURTHERMORE, HE'S ADMITTED IN A CONSENTUAL RECORDING

19  THAT NOW THAT HE HAS BEEN ARRESTED HE DOESN'T WANT TO GO INTO

20  IMMIGRATION CUSTODY AND THAT AUTHORITIES WOULD HAVE TO COME AND

21  GET HIM SHOULD HE BE RELEASED.

22       THIS IS ALSO A DEFENDANT WHO IS FACING 1O YEARS IN

23  PRISON.  HE'S GOT A PRIOR 46 MONTH SENTENCE FOR THE POSSESSION

24  WITH INTENT TO DISTRIBUTE COCAINE.  HE JUST CAME OFF SUPERVISED

25  RELEASE IN 2011, AND NOW HE IS BACK AT IT AGAIN.

1              HE IS FACING GUIDELINES AS DEFENSE MENTIONED OF

2   APPROXIMATELY FIVE YEARS IN CUSTODY.  HE'S GOT A PRIOR CARRYING

3   CONCEALED FIREARM CHARGE IN HIS BACKGROUND.

4              FOR THOSE FOREGOING REASONS, JUDGE, THE GOVERNMENT

5   DOES NOT FEEL THAT ANYTHING OTHER THAN PRETRIAL DETENTION IS

6   APPROPRIATE IN THIS CASE.  HE IS BOTH A RISK OF FLIGHT AND A

7   DANGER TO THE COMMUNITY AND WE WOULD ASK YOUR HONOR HOLD HIM

8   PENDING TRIAL.

9              MR. NATALE:  YOUR HONOR, MAY I JUST RESPOND BECAUSE I

10  DON'T KNOW WHAT RECORDING THEY'RE TALKING ABOUT WHERE HE SAYS

11  THAT HE -- ABOUT THAT HE IS NOT GOING TO GO BACK INTO

12  IMMIGRATION CUSTODY.

13             THE COURT:  THAT WAS THE PROFFER, THE FEBRUARY 11TH

14  PROFFER OF WHAT HE SAID -- WHAT THE DEFENDANT SAID TO THE

15  INFORMANT.

16             MR. ANTON:  YES, JUDGE.

17             THE COURT:  AND YOU'RE SAYING THAT THAT WAS RECORDED.

18             MR. ANTON:  IT WAS, JUDGE.

19             THE COURT:  THAT WAS THE TRANSCRIPT I THINK THAT --

20             MR. NATALE:  THAT HE WAS TALKING ABOUT -- IT'S

21  INTERESTING --

22             THE COURT:  IF SOMETHING HAPPENED TO HIM THAT --

23  RIGHT?

24             MR. ANTON:  YES, JUDGE.

25             THE COURT:  RIGHT.

1          MR. NATALE:  WELL, LET'S LOOK ABOUT THIS.

2          YOUR HONOR HAS BEEN INVOLVED IN THESE TYPES OF CASES.

3    HE IS SAYING HE WANTS GUNS.  HE IS SAYING HE WANTS AMMUNITION.

4    YET HE DOESN'T PURCHASE ANY, THEY DON'T OFFER HIM ANY, THERE IS

5    NONE OF THAT.

6          WHAT WE HAVE HERE IS THE MUTUAL TALKING AND PUFFING

7    BACK AND FORTH IN ORDER TO SEE IF PEOPLE ARE SERIOUS.  BUT WHEN

8    PUSH COMES TO SHOVE HE REJECTS EVERYTHING.  HE TALKS THE TALK.

9    NO DOUBT.  AND THERE IS NO DOUBT THAT HE HAD THE FIREARMS.

10   THAT'S A GIVEN.

11         WE ARE NOT TALKING ABOUT GUILT OR INNOCENCE HERE.

12   WE'RE TALKING ABOUT RISK OF FLIGHT.  AND WHEN THEY ASK FOR THE

13   VIOLENCE AFTER ALL THE PUFFING IS GONE, RIGHT, HE SAYS,

14   ABSOLUTELY NOT.  BUT CUBA?  YEAH.

15         NOW, LET'S LOOK AT THE CONFIDENTIAL SOURCE.  THE

16   CONFIDENTIAL SOURCE WHEN HE COMES BACK HE REALIZES THAT THIS IS

17   ALL GOING TO BE NONVIOLENT.  THEY DON'T TRY TO DO ANYTHING MORE

18   OF ANY VIOLENCE.  THEY DON'T TRY TO SELL HIM GUNS.  THEY DON'T

19   TRY TO DO ANYTHING.  THEY DON'T EVEN TRY TO BUY GUNS FOR HIM.

20         SO THE ISSUE AS FAR AS THE WEIGHT OF EVIDENCE AGAINST

21   HIM IS SUBSTANTIAL.  NO DOUBT ABOUT IT.  BUT AS FAR AS THE RISK

22   OF FLIGHT AND A DANGER TO THE COMMUNITY?  NO MORE DANGEROUS

23   THAN THE CONFIDENTIAL SOURCE WHO WAS TALKING UP THINGS.  NO

24   MORE DANGEROUS THAN THAT BECAUSE THERE WASN'T ONE AFFIRMATIVE

25   ACT THAT WAS DONE TO SHOW THAT HE WAS ACTUALLY INTERESTED IN

1   ANY OF THE TALK THAT WAS GOING BETWEEN THE TWO OF THEM.

2            JUST LIKE THE CONFIDENTIAL SOURCE.  BUT UNLIKE HIM,

3   THE CONFIDENTIAL SOURCE WENT TO DETROIT TO CHECK IT OUT.

4            THE COURT:  OKAY.  WELL, I UNDERSTAND YOUR ARGUMENT.

5   I THINK, MR. NATALE, AND PARTICULARLY FOCUSING ON THE ABSENCE

6   OF, AS YOU PUT AN AFFIRMATIVE ACT, TO KIND OF PUT INTO PLACE

7   ANY ACTS OF ACTUAL VIOLENCE OR TERROR.

8            BUT NEVERTHELESS, I DON'T THINK THAT'S NECESSARY HERE

9   FOR THE GOVERNMENT TO CARRY ITS BURDEN OF PROOF, AND I THINK

10  THE GOVERNMENT HAS.

11           SO I'M GOING TO ORDER MR. MORAN DIAZ THAT YOU BE

12  DETAINED.  I THINK THE GOVERNMENT HAS CARRIED ITS BURDEN OF

13  PROOF OF BOTH RISK OF FLIGHT AND DANGER.

14           THE STANDARD IS CERTAINLY NOT PROOF BEYOND A

15  REASONABLE DOUBT, THAT'S A PROOF AT TRIAL OF GUILT OR

16  INNOCENCE.  THIS IS A VERY DIFFERENT KIND OF HEARING TODAY.

17           SO IN TERMS OF -- AND THE QUESTION IS, IS THERE ANY

18  BOND CONDITIONS THAT THE COURT CAN IMPOSE THAT WILL REASONABLY

19  ASSURE THE COURT THAT YOU WON'T ENGAGE IN CRIMINAL CONDUCT

20  WHILE YOU ARE OUT AND THAT YOU WILL -- THAT WILL SHOW UP.  AND

21  I DON'T THINK THERE IS.

22           AS YOUR LAWYER ACKNOWLEDGES, WHAT YOU'RE ASKING FOR IS

23  A SIGNATURE BOND, A SIGNATURE AND ELECTRONIC MONITORING.  YOU

24  ARE NOT IN THE POSITION TO POST ANY ASSETS.  YOU DON'T HAVE A

25  HOME HERE, YOU DON'T HAVE SUFFICIENT ASSETS THAT YOU WOULD

1  FORFEIT THAT WOULD -- IF YOU DID IN OTHER CIRCUMSTANCES MIGHT

2  BE THE KIND OF -- IF THEY WERE THE KIND OF THINGS THAT SEEMED

3  VERY PRECIOUS TO YOU AND IMPORTANT TO YOU AND YOU WOULDN'T WANT

4  TO RISK LOSING THEM, THAT MIGHT BE THE KIND OF CONDITIONS YOU

5  START TO TALK ABOUT.  BUT YOU DON'T HAVE THAT.

6         YOUR JOB IS A NEW ONE.  I THINK IT IS JUST THE LAST

7  FEW MONTHS THAT YOU HAVE BEEN DRIVING FOR UBER.  YOU DON'T OWN

8  A HOME.  I THINK IT'S RENTAL WITH A GIRLFRIEND.  AND YOU REALLY

9  DON'T HAVE ANYTHING REALLY SAVED UP OR ANY BANK ACCOUNTS.

10         SO I DON'T HAVE THOSE KIND OF ASSETS.  IT'S A

11  SIGNATURE, IT'S A PROMISE, AND I DON'T THINK THAT REASONABLY

12  ASSURES THE COURT THAT YOU WILL BE SHOWING UP.

13         YOU KNOW, MR. NATALE -- AND THIS SHOWS HOW LONG HE HAS

14  BEEN DOING HIS JOB, HE OBVIOUSLY DOES IT VERY WELL, HOW LONG HE

15  HAS BEEN DOING THIS IN THIS DISTRICT.  BUT HE'S SAYING 63 TO 70

16  EIGHT MONTHS ISN'T THAT LONG.  THAT'S ABOUT 12 YEARS.  IT SEEMS

17  LIKE A LONG TIME TO ME, AND I WOULD THINK IT WOULD SEEM LIKE --

18  LIKE 1O, 12 YEARS?

19         MR. ANTON:  FIVE.

20         MR. NATALE:  FIVE.  SIXTY-EIGHT MONTHS.

21         THE COURT:  OH, HELLO.  OKAY.  THANK YOU.  I SHOULD

22  HAVE MY CALCULATOR.  FIVE YEARS TO ME IS STILL A LONG TIME TO

23  BE LOOKING AT PRISON.

24         SO -- RIGHT.  I DID FIGURE THAT OUT AS FIVE YEARS AND

25  I LOST IT.

1        NEVERTHELESS, THE EVIDENCE AGAINST YOU FOR BEING A

2   FELON IN POSSESSION OF A FIREARM IS VERY SUBSTANTIAL.  I AM NOT

3   SEEING A REAL DEFENSE TO IT HERE.  SO I THINK YOU ARE A SMART

4   GUY AND YOU KNOW THAT THE ODDS ARE VERY GOOD, YOU ARE GOING TO

5   BE CONVICTED OF THIS OFFENSE AND YOU'RE GOING TO GO TO PRISON

6   FOR FIVE YEARS.  LET'S CALL IT THAT.

7        THE QUESTION ISN'T WHETHER YOU WOULD FLEE TO CUBA.

8   THE QUESTION IS WHETHER YOU WOULD MAKE YOURSELF UNAVAILABLE IN

9   SOME OTHER WAY.  AND I DON'T HAVE ANY CONFIDENCE THAT A

10  SIGNATURE BOND OR ELECTRONIC MONITORING, WHICH YOU CAN CUT OFF

11  OF YOU AND EVADE IS GOING TO REASONABLY ASSURE THE COURT THAT

12  YOU WILL SHOW UP.

13       REGARDING DANGER TO THE COMMUNITY.  I AM DELIGHTED

14  THAT THERE ARE NO AFFIRMATIVE ACTS THAT YOU TOOK TO PUT SOMEONE

15  ELSE IMMEDIATELY IN DANGER.  BUT YOUR TALK AND YOUR BEHAVIOR

16  INDICATES A STRONG INTEREST IN DOING SO.

17       AND THE FACT THAT PERHAPS AS YOUR LAWYER SAID YOU

18  SHIFTED THAT FOCUS FROM THE UNITED STATES TO CUBA DOESN'T MAKE

19  ME FEEL MUCH BETTER ABOUT THAT.  I MEAN, THE THOUGHT THAT YOU

20  WOULD WANT TO ENGAGE IN SOME SORT OF VIOLENT ACTIONS IN CUBA IS

21  VIOLENCE.  SO I AM JUST NOT REALLY PERSUADED BY THAT ARGUMENT.

22       AND THE GOVERNMENT, I THINK -- GOVERNMENT COUNSEL KIND

23  OF REVIEWED, AND I WON'T DO IT NOW, THE VARIOUS PLACES IN THE

24  AFFIDAVIT AND THEN WE HEARD SOME TESTIMONY IN WHERE YOU EXPRESS

25  THIS INTEREST IN VIOLENCE.  SO I WON'T REVIEW ALL OF THAT NOW.

1  BUT IT IS PART OF THE RECORD, IT IS PART OF THE AGENT'S

2  AFFIDAVIT.

3          SO I THINK THAT SUMMARIZES THE FACTUAL FINDINGS THAT I

4  WOULD RELY UPON.  I WOULD DO IT IN SOME MORE DETAIL IN AN

5  ORDER.

6          I WILL ASK MR. ANTON TO E-MAIL TO ME SOMETIME TODAY A

7  PROPOSED ORDER THAT REFLECTS A DETENTION BOTH -- ON BOTH

8  GROUNDS.

9          I THINK MR. NATALE HAS REBUTTED THE PRESUMPTIONS.  SO

10  WE DON'T NEED TO GO INTO THAT.  I JUST THINK IN THE END YOU

11  HAVE CARRIED YOUR BURDEN OF PROOF.

12          I WOULD ASK YOU TO TRY TO MAKE THOSE FACTUAL FINDINGS

13  THAT I GENERALLY TOUCHED ON HERE, AND YOU COULD E-MAIL THAT TO

14  MY CHAMBERS TODAY.

15          MR. ANTON:  YES, YOUR HONOR.

16          THE COURT:  OKAY.  THAT'S ALL WE ARE DOING HERE TODAY.

17  NO ARRAIGNMENT.

18          MR. NATALE:  RIGHT.

19                          - - -

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5

6   UNITED STATES OF AMERICA

7   SOUTHERN DISTRICT OF FLORIDA

8

9

10        I, CARL SCHANZLEH, OFFICIAL COURT REPORTER OF THE UNITED

11  STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, DO

12  HEREBY CERTIFY THAT THE FOREGOING 36 PAGES CONSTITUTE A TRUE

13  TRANSCRIPT OF THE PROCEEDINGS HAD BEFORE THE SAID COURT HELD IN

14  THE CITY OF MIAMI, FLORIDA, IN THE MATTER THEREIN STATED.

15        IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS

16  20TH DAY OF AUGUST 2015.

17

18                              /S/CARL SCHANZLEH
                                CARL SCHANZLEH, RPR-CM
19                              CERTIFIED COURT REPORTER
                                9960 SW 4TH STREET
20                              PLANTATION, FL 33324
                                TELEPHONE 954 424-6723
21

22

23

24

25