```
 1                     UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF FLORIDA
 2                           MIAMI DIVISION
                     CASE NO. 15-20264-CRIMINAL-LENARD
 3

 4    UNITED STATES OF AMERICA,          Miami, Florida

 5                   Plaintiff,          July 27, 2015

 6           vs.                         4:03 p.m. to 4:55 p.m.

 7    MIGUEL MORÁN DÍAZ,

 8                   Defendant.          Pages 1 to 28
      _____

 9

10                          SENTENCING HEARING
                    BEFORE THE HONORABLE JOAN A. LENARD,
11                    UNITED STATES DISTRICT JUDGE

12

13    APPEARANCES:

14

      FOR THE GOVERNMENT:        MARC ANTON, ESQ.
15                               ASSISTANT UNITED STATES ATTORNEY
                                 99 Northeast Fourth Street
16                               Miami, Florida 33132

17

      FOR THE DEFENDANT:         DANIEL ECARIUS, ESQ.
18                               ASSISTANT FEDERAL PUBLIC DEFENDER
                                 150 West Flagler Street
19                               Miami, Florida 33130

20

      FOR US PROBATION:          MICHELLE BURGESS
21

22    REPORTED BY:               LISA EDWARDS, RDR, CRR
                                 Official Court Reporter
23                               United States District Court
                                 400 North Miami Avenue
24                               Twelfth Floor
                                 Miami, Florida 33128
25                               (305) 523-5499
```

```
 1              THE COURT:  United States of America versus Miguel

 2   Morán Díaz, Case No. 15-20264.

 3              Good afternoon, counsel and Probation.  State your

 4   appearances, please, for the record.

 5              MR. ANTON:  Good afternoon, your Honor.  Marc Anton on

 6   behalf of the United States.

 7              THE COURT:  Good afternoon.

 8              MR. ECARIUS:  Good afternoon, Judge.  Daniel Ecarius

 9   from the Federal Defender's Office on behalf of Mr. Miguel

10   Morán Díaz, who's seated next to me.

11              THE COURT:  Good afternoon.

12              THE PROBATION OFFICER:  Good afternoon, your Honor.

13   Michelle Burgess on behalf of US Probation.

14              THE COURT:  Good afternoon.

15              Mr. Morán Díaz is set for sentencing today.

16              Mr. Morán, have you read the revised advisory

17   presentence investigation report and its addendums?

18              THE DEFENDANT:  Yes.

19              THE COURT:  And have you and your attorney discussed

20   the advisory presentence investigation report and its

21   addendums?

22              THE DEFENDANT:  Yes.

23              THE COURT:  My examination of the file indicates that

24   neither the Government nor the Defendant have filed any

25   objections to the revised advisory presentence investigation
```

1    report and its addendums.  And neither side has filed any

2    additional motions.

3            Is that correct?

4            MR. ANTON:  That's correct, your Honor.

5            MR. ECARIUS:  That's correct, your Honor.

6            THE COURT:  Does the Government make the motion for the

7    third level off under 3E1.1?

8            MR. ANTON:  Yes, your Honor.

9            THE COURT:  That motion is granted.

10           The Court will adopt the factual findings and guideline

11   applications as contained in the revised advisory presentence

12   investigation report.

13           Before going further, I would ask counsel to review

14   with me the major calculations in the revised advisory

15   presentence investigation report.  The offense level is 19; the

16   criminal history category is Roman Numeral II; the advisory

17   guideline range is 33 to 41 months' imprisonment, one to three

18   years' supervised release; $100 special assessment.

19           Is that correct in its totality?

20           MR. ANTON:  Yes, your Honor.

21           MR. ECARIUS:  Yes, your Honor.

22           THE COURT:  Mr. Morán, you are in court today to

23   receive your sentence.  Before that happens, I must ask you if

24   there's any legal cause as to why the sentence of the law

25   should not be imposed upon you.

 1          MR. ECARIUS:  No legal cause.

 2          THE COURT:  No legal cause having been shown as to why

 3  sentence should not be imposed, the Court will consider

 4  whatever you may wish to say in mitigation.

 5          Yes, Mr. Ecarius.

 6          MR. ECARIUS:  Your Honor, I would ask you to consider

 7  that Mr. Morán Díaz did accept responsibility promptly in this

 8  case.  He's certainly very sorry for this situation.

 9          He's 45 years old.  He's somebody who does have a long

10  work history.  He was mostly compliant when he was on

11  supervision last time.

12          I would ask the Court to consider the low end of the

13  guideline range in this case.  I think that would be sufficient

14  to punish and deter in this case.

15          Again, he will be on supervised release.  There will be

16  someone monitoring him after he's released.  I think under the

17  circumstances of this case, that would be appropriate.

18          Thank you.

19          THE COURT:  Mr. Morán, is there something you want to

20  say, sir?

21          THE DEFENDANT:.  Yeah.  I just want to take this brief

22  opportunity to apologize to the community, to the

23  US Government, my family of course, which is going through a

24  lot right now, without my help.  My mother in Cuba is very

25  concerned about my situation.  I just want to guarantee it

1    won't happen again, you know.

2          That's it.

3          THE COURT:  What does the Government say?

4          MR. ANTON:  Judge, it's the Government's position that

5    a sentence at the high end of the guideline range is the most

6    appropriate sentence in this case.

7          As your Honor is aware from reviewing the presentence

8    investigation report, this is a Defendant who possesses violent

9    beliefs, as evidenced by his Facebook posts regarding ISIS, a

10   known foreign terrorist organization.

11         This is a Defendant who wanted to purchase additional

12   firearms from a confidential human source, including a

13   .308-caliber rifle and a Glock handgun.

14         This is a Defendant who bragged about how his

15   collapsible stock rifle was perfect to smuggle into a stadium

16   undetected.

17         This is a Defendant who conducted active surveillance

18   of targeting locations in Miramar, Florida, a Homeland Security

19   processing facility.

20         This is a Defendant who indicated his desire to be a

21   lone wolf --

22         THE COURT:  Where is that information?  I saw that

23   information in the detention order, but it was not contained in

24   the report about surveilling the Homeland Security processing

25   facility.  And I don't believe it was in the factual proffer.

1          MR. ANTON:  Judge, that information was brought out at

2    the detention hearing as a result of surveillance that was

3    conducted by the FBI.  There were undercover observations of

4    the Defendant, along with this source, conducting surveillance

5    at the Homeland Security processing facility in Miramar,

6    Florida.  Early on in this investigation, the Defendant had

7    discussed conducting attacks with a potential bomb.

8          Ultimately, those negotiations or conversations kind of

9    petered out, and the Government was ultimately left with the

10   firearms charge in this particular case.  But there was a time

11   over a course of between January and April of 2015 when the

12   Defendant and the undercover source in this particular case

13   were conducting pretty hot-and-heavy active discussions and

14   surveillance regarding an attack here in the United States.

15         Judge, this is also a Defendant, as I mentioned, who

16   indicated he wanted to be a lone wolf for ISIS.  He advocated

17   killing people and inscribing "ISIS" into shell casings.  He

18   viewed instructions on bomb making in *Inspire* magazine, which

19   is Al-Qaeda's propaganda magazine.

20         He was observed actively practicing firing and shooting

21   his weapons.  He wanted to buy more ammunition from our source.

22   And during the takedown in this particular case, there was a

23   loaded firearm with 15 rounds in the firearm itself and an

24   additional 15 rounds in a magazine contained on his person.

25         During a search warrant execution at his residence, the

 1  law enforcement officers found a rifle with 297 more rounds of

 2  ammunition.

 3        This is a Defendant who in his criminal history

 4  section, Judge, has a prior conviction for carrying a concealed

 5  firearm in 1995.  Undeterred, he became involved with a

 6  conspiracy to possess with intent to deliver over 4 kilos of

 7  cocaine and was sentenced to 46 months in 2005.

 8        He was released in 2008, and this offense occurred in

 9  January of 2015.

10        During his confession, he indicated, according to him,

11  that his terroristic threats were a joke, but that he did

12  support the Islamic caliphate, and he did not want to commit

13  any violent acts in the United States.

14        THE COURT:  Where is that in the report?  That's the

15  first time I hear any of that.  Where is that in the revised

16  advisory presentence report?

17        MR. ANTON:  The portions dealing with the confession,

18  your Honor, is not in the report.  That, again, was brought out

19  at the detention hearing.

20        MR. ECARIUS:  Your Honor, I object to that being

21  considered as part of the factual basis for the sentencing.

22  It's not in the report.  I haven't had time to analyze that or

23  respond to that.

24        THE COURT:  I would agree.  I'm not going to consider

25  any statements he made or any of the surveillance of the

1   Homeland Security Processing Center or discussion of attacks

2   regarding bombs other than what's in the revised advisory

3   presentence investigation report.

4          MR. ANTON:  Understood, your Honor.

5          THE COURT:  It does contain viewing an online magazine

6   and discussions with the confidential source about at least two

7   bombs.

8          MR. ANTON:  Understood, your Honor.

9          The Defendant was ultimately sentenced to the 46 months

10  on his cocaine conspiracy, released and conducted the instant

11  offense over the course of approximately four months in early

12  2015.

13         This is not an individual, your Honor, who is deserving

14  of the low end of the guideline range.  This is a violent

15  individual who didn't just simply possess a firearm as a

16  convicted felon.

17         It's the Government's position that the Defendant's

18  offense conduct in this case was much more serious than a

19  simple possession of a firearm by a convicted felon, especially

20  in light of fact that he had a prior concealed firearm carry

21  back in 1995 and didn't learn his lesson, then again got

22  involved with very serious criminal activity here in federal

23  court and in 2005 and continued his ways by not carrying just

24  one firearm, but possessing two firearms in conjunction with

25  these extremely serious beliefs and actions taken over the

1    course of four months.

2          THE COURT:  Anything further, Mr. Ecarius?

3          MR. ECARIUS:  Your Honor, I would note that the reason

4    things petered out is because he was being encouraged by the

5    confidential source to go forward and to engage in some kind of

6    terrorist activity.  He did not take that bait.  He didn't go

7    forward with it.  He wasn't interested in that.  That's why

8    that case petered out eventually.

9          He does admit that he had firearms and he was not

10   supposed to have them.

11         As to his personal beliefs, I'm not going to comment on

12   that.

13         But, your Honor, I would ask the Court to consider the

14   charges that he has here and the fact that he accepted

15   responsibility for them and that he is -- that the -- that he's

16   here at this time having accepted responsibility.

17         Thank you.

18         THE COURT:  What I'm going to consider here today is

19   the factual proffer and the relevant offense conduct as

20   contained in the revised advisory presentence investigation

21   report, to which there were no objections.  So those facts are

22   taken as true.

23         Under United States Code, Title 18, United States Code,

24   Section 3553(a), the Court shall impose a sentence sufficient

25   but not greater than necessary to comply with the purposes set

1   forth in Paragraph 2 of this subsection.

2         The Court in determining the particular sentence to be

3   imposed shall consider -- in the Eleventh Circuit in the cases

4   of *United States versus Rosales-Bruno* and *United States versus*

5   *Shaw* -- and *Rosales-Bruno* is 2015 Westlaw 3825109, a June 19th,

6   2015, decision; and *United States versus Shaw* is 560 F.3d 1230,

7   a 2009 decision.

8         And in those decisions, the Eleventh Circuit details

9   how the Court with that language "shall" is required to

10  consider the various factors under 3553, all the factors,

11  including the advisory guidelines.

12        And in *Rosales-Bruno*, the Eleventh Circuit stated as

13  follows at Headnote I:  "The District Court's task is to impose

14  a sentence that will adequately (1) "reflect the seriousness of

15  the offense; (2) promote respect for the law; (3) provide just

16  punishment; (4) afford adequate deterrence; (5) protect the

17  public from further crimes of the Defendant; and (6) provide

18  the Defendant with any needed training and treatment in the

19  most effective manner."

20        The task is a holistic endeavor that requires the

21  District Court to consider a variety of factors:  (1) the

22  nature and circumstances of the offense; (2) the Defendant's

23  history and characteristics; (3) the kinds of sentences

24  available; (4) the applicable sentencing guideline range; (5)

25  pertinent policy statements of the Sentencing Commission; the

1   need to provide restitution to any victims; and (6) the need to

2   avoid unwarranted sentencing disparities.

3            The Eleventh Circuit goes on to state at Page 4:  "As

4   the governing statute makes clear, and as we have explained in

5   an *en banc* opinion, the advisory guideline range is but one of

6   many considerations that a Court must take into account in

7   exercising its sentencing discretion," citing the *en banc*

8   decision in *United States versus Irey*, I-R-E-Y, 612 F.3d. 1160,

9   at 1217, a 2010 decision by the *en banc* Eleventh Circuit.

10           And in that decision, Eleventh Circuit goes on to

11   state -- in *United States versus Shaw* to state:  "To arrive at

12   an appropriate sentence, the District Court must consider all

13   of the applicable 3553(a) factors."  And *Rosales-Bruno* teaches

14   us that the Court can accord and is permitted to attach great

15   weight to one factor over another, and the 3553(a) factors do

16   not have to be given equal weight.

17           *Rosales*-Bruno goes on to state that "In assigning

18   weight to the 3553(a) factors as part of the weighing process,

19   a Court may and should consider individualized, particularized

20   specific facts and not merely the guidelines label that can be

21   put on the facts."

22           And in *United States versus Shaw*, the 2009 decision by

23   the Eleventh Circuit, which is a case that factually is

24   analogous to this case in that that Defendant was charged with

25   possession of a firearm by a convicted felon, his advisory

1    guideline range was 30 to 37 months' imprisonment; and Judge

2    Moore sentenced him to the statutory maximum.

3              And in that case, the Eleventh Circuit cited, as do I

4    today, *Gall versus United States*, 552 US 38, 128 Supreme Court,

5    586, a 2007 decision by the United States Supreme Court.  At

6    1237 and 1238, the Eleventh Circuit stated as follows:  "The

7    District Court must evaluate all of the 3553(a) factors when

8    arriving at a sentence, but is permitted to attach great weight

9    to one factor over others.

10             In assessing the factors, the sentencing Court should

11   remember that each -- this is the quote from *Gall* at 598:

12   "Each convicted person is an individual and every case is a

13   unique study in the human failings that sometimes mitigate,

14   sometimes magnify the crime and the punishment to ensue."

15             And the *Shaw* case goes on at 1238 to state:  "When the

16   district court decides after serious consideration that a

17   variance is in order, it should explain why that variance is

18   appropriate in a particular case with sufficient

19   justifications.  The justifications must be compelling enough

20   to support the degree of the variance and complete enough to

21   allow meaningful appellate review."

22             And here, after giving serious consideration to all of

23   the 3553(a) factors, including the advisory guidelines, I find

24   that an upward variance to the statutory maximum of 120 months

25   is the appropriate sentence.

1          Under 3553(a), the Court first shall consider the

2    nature and circumstances of the offense and the history and

3    characteristics of the Defendant.

4          The Defendant stands before the Court having pled

5    guilty to felon in possession of a firearm and ammunition under

6    Title 18, United States Code, Section 922(g)(1).

7          And the nature and circumstances of the offense, as

8    detailed in the offense conduct, the relevant offense conduct

9    in the revised advisory presentence investigation report,

10   revolved around these facts:  The FBI launched an investigation

11   of the Defendant who maintained a Facebook page under the name

12   of Azizi al-Hariri.  A review of that page revealed numerous

13   postings of ISIS, a known terrorist organization, related

14   articles and a posting showing the Defendant with a firearm.

15         A confidential source then met with the Defendant and

16   the Defendant introduced himself as Miguel.

17         The Defendant at that meeting asked the confidential

18   source to purchase a "Baby Glock" for him and discussed with

19   the confidential source that he wished to purchase several

20   weapons and that he would arrange -- the Defendant would

21   arrange to have the weapons stolen from the confidential

22   source's vehicle so the confidential source could claim they

23   were stolen.  And he agreed that he would pay the confidential

24   source $500 in United States currency.

25         During that first meeting, the Defendant also told the

1    confidential source that he was a convicted felon and therefore

2    he could not purchase the firearms himself.

3           The Defendant went on to tell the confidential source

4    that he had multiple weapons, including a rifle he used for

5    hunting in the Everglades, and a Kel-Tec 2000 with a

6    collapsible stock.  And he further explained that the Kel-Tec

7    2000 with the collapsible stock was a perfect firearm because

8    he would be able to hide it in his backpack and then go to a

9    stadium -- into a stadium undetected.

10          He additionally told the confidential source that he

11   possessed a Springfield XD(M) handgun and then showed a picture

12   of himself on his cell phone holding a rifle with a scope,

13   another picture of a rifle with a collapsible stock and green

14   sight that he identified as the Kel-Tec 2000.

15          He then proceeded to take the confidential source to

16   his vehicle and showed him a gray backpack that was on the

17   front passenger floorboard.  He instructed the confidential

18   source to open the backpack and to open his shirt that was

19   inside the second zippered pocket; and wrapped inside that

20   shirt was a loaded handgun, the Springfield XD(M) .40.

21          So here, we have a Defendant who was charged with one

22   count of possession of a firearm and ammunition.  And he was in

23   possession of two guns and over 300 rounds, as the facts detail

24   in the revised advisory presentence investigation report, of

25   .40-caliber ammunition.

1        On January 30th, the Defendant and the confidential

2   source met again; and the Defendant then instructed the

3   confidential source to enter his vehicle.  And the Defendant

4   described himself as a lone wolf for the ISIS group.  He went

5   on to state that he wanted to acquire a Savage .308-caliber

6   bolt-action rifle and he was going to scratch "ISIS" in the

7   .308 shell casings.  And then he described that after killing

8   people, authorities would find the ISIS-engraved shell casings

9   and know that there was a sniper in town, that he could put the

10  city in checkmate and disrupt the city for a week or two until

11  he was being caught.

12       Later that same day in the evening, the Defendant and

13  the confidential source viewed a terrorist-inspired magazine

14  website, and the Defendant explained to the confidential source

15  that the magazine provided detailed instructions on how to

16  build bombs.

17       And then he stated that the Boston bombers found their

18  bomb on this magazine and that was the instructions provided to

19  them, and he showed the confidential source detailed

20  instructions from the magazine on how to construct a car bomb

21  using oxygen and propane tanks as fuel.

22       On February 8th, 2015, the Defendant and the

23  confidential source met and drove to a remote area of

24  Everglades National Park and exited the vehicle on foot.  They

25  both carried backpacks with weapons to an area where they then

1   proceeded to have shooting practice with the Defendant shooting

2   two weapons, a Springfield XD(M) .40-caliber handgun and a

3   .40-caliber Kel-Tec 2000 rifle with a collapsible stock.

4          At the Defendant's request, the confidential source

5   used a cellular telephone to record the target shooting.

6          Then on April 2nd, a search warrant was issued for the

7   Defendant's residence and his car.  The Defendant was stopped

8   in his vehicle, and in his waistband was a loaded with 15

9   rounds of .40-caliber ammunition -- a loaded Springfield XD(M)

10  .40-caliber handgun, and in his pocket was a .40-caliber

11  magazine that was loaded with 15 rounds of .40-caliber

12  ammunition.

13         The search warrant was then executed on his residence.

14  At the residence, the FBI agents recovered a Kel-Tec 2000

15  .40-caliber rifle and approximately 297 rounds of .40-caliber

16  ammunition.

17         The items were recovered from a bedroom that was

18  utilized by the Defendant and contained his personal property

19  and identity documents.

20         After given his Miranda warnings, the Defendant advised

21  that he was aware that he was not supposed to own or possess

22  weapons due to his prior felony conviction and that he had

23  purchased the weapons from private individuals to avoid

24  scrutiny and purchased the ammunition from local gun stores.

25         The Court also shall consider the history and

1    characteristics of the Defendant.

2            The Defendant is 45 years old.  He completed a year of

3    college at the John Jay College of Criminal Justice in

4    New York.  His criminal history began over 20 years ago.

5            On December 29th, 1994, he was adjudicated guilty for

6    petty larceny.  And the facts -- when he was 25 years old --

7    the facts underlying that offense is that he was driving a

8    stolen vehicle.  He was given one day of credit time served and

9    adjudicated guilty.

10            He then was arrested on November 18th, 1995.  And on

11   December 20th, 1995, he was adjudicated guilty for carrying a

12   concealed firearm.

13            He was stopped on a traffic stop.  And when he was

14   asked by the Miami Police officer whether he had any weapons,

15   he said yes.  A search of the vehicle revealed a 9-millimeter

16   Beretta pistol inside a holster and under the passenger seats.

17   For that offense, he was adjudicated guilty.  On December 20th,

18   1995, he was given six months' probation; and interestingly

19   enough, the probation was terminated on that same day.

20            He then is arrested again on March 3rd, 2005.  And he

21   pleads guilty to conspiracy to possess with intent to

22   distribute cocaine before Judge Highsmith in Case No. 05-20216.

23   He receives a sentence of 46 months' imprisonment and three

24   years' supervised release.  He's 35 years old.

25            And the underlying facts in that case were that the

1    Defendant had purchased 4 kilograms of cocaine with $30,000 in

2    cash.

3            The Defendant has continuously worked since he arrived

4    in this country either as a driver or in construction.

5            The Court also in determining a sentence that is

6    sufficient but not greater than necessary shall consider the

7    need for the sentence imposed to reflect the seriousness of the

8    offense, to promote respect for the law and to provide just

9    punishment for the offense.

10           So here, we have a Defendant who has had several

11   contacts with the criminal justice system.  For two of those

12   contacts, he received basically no sentence or very little

13   sentence.  And for the conspiracy to possess with intent to

14   distribute cocaine, he received a 46-month sentence.  And none

15   of those sentences apparently have been sufficient for the

16   Defendant to change his criminal conduct.

17           The offense conduct here establishes that the Defendant

18   was being inspired by ISIS and terrorist activities; that he

19   had thought out two ways to be a lone wolf:  One, he was going

20   to proceed to a stadium with the Kel-Tec 2000 with the

21   collapsible stock and he would utilize that firearm because,

22   with a collapsible stock, it was perfect.  He could go into the

23   stadium undetected with the firearm in his backpack.

24           The second way that he had thought out that he was

25   going to be a lone wolf is that he would disrupt the city for

1    up to two weeks by killing people, by being a sniper, and the

2    police would find engraved shell casing that he would engrave

3    with the word "ISIS."  He would put the city in checkmate.

4         He also had researched and read online and showed the

5    confidential source about making bombs.  He identified the

6    bombs, bombs that were used by the Boston bombers on Patriots

7    Day, and he spoke about and described a car bomb and exactly

8    how car bombs could be made.

9         This is not his first gun charge.  He previously was

10   convicted of carrying a concealed firearm.

11        And even the 46-month sentence that he received from

12   Judge Highsmith has not deterred him from further crimes.

13        I find that more punishment is needed to deter the

14   Defendant from further crimes and to promote respect for the

15   law.

16        The Defendant himself even stated to the confidential

17   source that he knew he was a convicted felon and he couldn't

18   possess a firearm.

19        I find that a more severe sentence is needed to protect

20   the public.  The prior sentences were not enough to stop the

21   Defendant from committing other crimes.

22        And even though the Defendant was prohibited by law to

23   have firearms and ammunitions, he possessed two firearms, at

24   least two firearms and ammunition, and he thought about how he

25   was going to utilize those firearms to kill a lot of people.

1         The sentence that I impose -- the Court shall consider

2    the need for the sentence imposed to afford adequate deterrence

3    to criminal conduct not only of this Defendant, though I found

4    that a more severe sentence is necessary to deter criminal

5    conduct, but other persons who may be considering such conduct.

6         And I cite various statements that have been made in

7    recent months by James Comey, the director of the Federal

8    Bureau of Investigation, who in a statement before the Senate

9    Select Committee on Intelligence in Washington, DC, on July

10   8th, 2015, stated the following:

11        Quote:  "We continue to identify individuals who seek

12   to join the ranks of foreign fighters traveling in support of

13   the Islamic State of Iraq and the Levant, commonly known as

14   ISIL, and also homegrown violent extremists who may aspire to

15   attack the United States from within.  These threats remain

16   among the highest priorities for the FBI and the intelligence

17   community as a whole.

18        "We closely analyze and assess the influence groups

19   like ISIL have on individuals located in the United States who

20   are inspired to commit acts of violence.  Whether or not the

21   individuals are affiliated with a foreign terrorist

22   organization and are willing to travel abroad to fight or are

23   inspired by the call to arms to act in their communities, they

24   potentially pose a significant threat to the safety of the

25   United States and United States persons."

1        "Social media" -- he went on to state, "Social media

2   has allowed groups such as ISIL to use the Internet to spot and

3   assess potential recruits.  With the widespread horizontal

4   distribution of social media, terrorists can identify

5   vulnerable individuals of all ages in the United States, spot,

6   access, recruit and radicalize, either to travel or to conduct

7   a homeland attack."

8        The assistant director of the counterterrorism division

9   for the Federal Bureau of Investigation, Michael B. Steinbach,

10  stated on June 3rd, 2015, in a statement before the House

11  Homeland Security Committee, quote:  "ISIL continues to

12  disseminate their terrorist message to all social media users,

13  regardless of age.  Following other groups, ISIL has advocated

14  for lone wolf attacks."

15       Exactly how this Defendant identified himself:  a lone

16  wolf for ISIS.

17       Mr. Steinbach also stated on February 26, 2015, in a

18  statement before the House Judiciary Committee Subcommittee on

19  Crime, Terrorism, Homeland Security and Investigations, quote:

20  "We are concerned about the possibility of homegrown extremists

21  becoming radicalized by information available on the Internet."

22       Exactly what happened here.  The access to the

23  terrorist magazine about building bombs, ISIS-related articles,

24  this Defendant posted on his Facebook page along with photos of

25  himself armed and discussions with the confidential source

1    about what he wanted to accomplish with the purchase and use of

2    these firearms.

3         Mr. Steinbach went on to state at that hearing, quote:

4    "Individuals inspired by foreign terrorist groups could quietly

5    arm themselves with the expertise and tools to carry out an

6    attack.  Community and world events may trigger one of these

7    individuals to take action."

8         And on July 21st, 2015, at the FBI regional office in

9    Salt Lake City, Utah, FBI Director James Comey stated that ISIS

10   is actively recruiting in every state in the nation.  And he

11   stated as follows, quote:  "What ISIL brings to us is a

12   crowd-sourcing of terrorism using social media in a way that

13   Al-Qaeda never imagined," end quote.

14        Quote:  "Their message is:  Travel to the caliphate,

15   their so-called Islamic wonder world.  Join us here in Iraq or

16   Syria.  And if you can't travel, kill somebody where you are.

17   Kill somebody in uniform, preferably in the military or law

18   enforcement, but just kill somebody," end quote.

19        He went on to state, quote:  "In every state, we have

20   investigations trying to understand where people are on the

21   spectrum, from consumers of this poison to actors on behalf of

22   this organization," end quote.

23        So here, we have a Defendant who was on the spectrum.

24   He consumed this poisonous information and he detailed at least

25   his thought process of how he was going to accomplish this and

1   what he wanted to do while he possessed firearms that he was

2   not allowed to possess as a convicted felon.

3          The jurisprudence teaches us that the advisory

4   guidelines are but one factor under 3553(a), that the Court

5   shall consider all the 3553(a) factors and in its discretion

6   may accord the appropriate weight to the factors under 3553(a).

7          I find after considering the individualized,

8   particularized facts underlying the offense conduct and the

9   history and characteristics of the Defendant that the combined

10  force of the other 3553(a) factors are entitled to greater

11  weight than the advisory guideline range.

12         Those include the seriousness of the offense; the need

13  to protect the public; the need to promote respect for the law;

14  the need to afford adequate deterrence of criminal conduct of

15  this Defendant and other persons who may be considering such

16  conduct; his criminal history, including a prior gun charge and

17  a 46-month sentence for conspiracy to possess with intent to

18  distribute cocaine that did not deter the Defendant from

19  further conduct; and the nature and circumstances of the

20  offense here.

21         Therefore, I find after considering all of the 3553(a)

22  factors under Title 18, including the advisory guideline range,

23  that the appropriate sentence is the statutory maximum in this

24  case.  And therefore, I will upwardly vary from the advisory

25  guideline range to the statutory maximum.

1          If you would stand with your client, please.

2          The Court has considered the statements of the parties,

3     the revised advisory presentence investigation report, which

4     contains the advisory guidelines, and the statutory factors set

5     forth in Title 18, United States Code, Section 3553(a).

6          It is the finding of the Court that the Defendant is

7     not able to pay a fine, and therefore no fine shall be imposed.

8          Pursuant to the Sentencing Reform Act of 1984, it is

9     the judgment of the Court that the Defendant, Miguel Morán

10    Díaz, is hereby committed to the custody of the United States

11    Bureau of Prisons to be imprisoned for 120 months.

12         Upon release from imprisonment, the Defendant shall be

13    placed on supervised release for a term of three years.

14         Within 48 hours of release from the custody of the

15    United States Bureau of Prisons, the Defendant shall report in

16    person to the probation office in the district to which he is

17    released.

18         While on supervised release, the Defendant shall not

19    commit any federal, state or local crimes; he shall be

20    prohibited from possessing a firearm or other dangerous device;

21    he shall not possess a controlled substance; he shall cooperate

22    in the collection of DNA and shall comply with the standard

23    conditions of supervised release that have been adopted by this

24    Court and with the following special conditions:

25         The Defendant shall submit to a search of his person or

1   property conducted in a reasonable manner and at a reasonable

2   time by the United States probation officer.

3       The Defendant shall not possess or use a computer or

4   any access device with access to the Internet at any location

5   without the prior written approval of the United States

6   probation officer.

7       The Defendant is prohibited from associating with or

8   visiting specific places either online or in person or

9   individuals or groups such as terrorists, members of

10  organizations advocating violence, organized crime, documented

11  members of terrorist organizations or those known to be or

12  frequent either online or in a physical place.

13      The Defendant shall provide complete access to

14  financial information, including disclosure of all business and

15  personal finances.

16      At the completion of the Defendant's term of

17  imprisonment, the Defendant shall be surrendered to the United

18  States Immigration and Customs Enforcement for removal

19  proceedings consistent with the Immigration and Nationality

20  Act.

21      If the Defendant is removed or if he voluntarily leaves

22  the United States, he shall not reenter the United States

23  without the prior express written permission of the Secretary

24  of Homeland Security.

25      The term of the supervised release period shall be

1    nonreporting while the Defendant resides outside the United

2    States.

3          If the Defendant should receive the prior express

4    written permission of the Secretary of Homeland Security and

5    reenter the United States within the term of the supervised

6    release period, he is to report to the nearest United States

7    Probation Office in the district to which he reenters within 48

8    hours of his arrival.

9          It is further ordered that the Defendant shall pay to

10   the United States a special assessment of $100, which shall be

11   due immediately.

12         And there are no remaining counts.  Correct?

13         MR. ANTON:  No additional counts, your Honor.  That is

14   correct.

15         THE COURT:  Mr. Morán Díaz, it is my duty to inform

16   you, sir, that you have 14 days with which to appeal the

17   judgment and sentence of this Court.  Should you desire to

18   appeal and be without funds with which to prosecute an appeal,

19   an attorney will be appointed to represent you in connection

20   with that appeal.

21         Should you fail to appeal within that 14-day period, it

22   will constitute a waiver of your right to appeal.

23         It is also my duty to elicit from counsel from both

24   sides fully articulated objections to the Court's finding of

25   facts and conclusions of law as announced at this sentencing

```
 1   hearing and to further elicit any objections which either side

 2   may have to the manner in which sentence was imposed in this

 3   case.

 4           Are there any objections from the Government?

 5           MR. ANTON:  There are no objections from the

 6   Government, your Honor.

 7           But I would note that there were forfeiture allegations

 8   contained in the indictment.  I'd ask that your Honor impose

 9   forfeiture as well.

10           THE COURT:  Any objection to the motion for forfeiture?

11           MR. ECARIUS:  No objection.

12           THE COURT:  It'll be included in the judgment and

13   commitment order.

14           Any objections by the Defendant?

15           MR. ECARIUS:  Yes, your Honor.

16           We object to the upward variance.  We don't believe

17   that it was reasonable in applying the 3553(a) factors.

18           And it allowed -- the conduct that was cited was simply

19   conversation, a lot of which was elicited and encouraged by the

20   confidential informant to try to encourage Mr. Morán Díaz to do

21   something more serious.

22           And that that's the basis for -- that his -- his

23   statements are the result of this type of encouragement and

24   this type of management by the confidential source.

25           And that that is used to enhance him and that's -- that
```

```
 1       that analysis is not a good basis for the enhancement.

 2             And that the sentence is unreasonable under the

 3       circumstances.

 4             THE COURT:  It's noted for the record.

 5             The marshal will execute the sentence of the Court.

 6             We're in recess in this matter.

 7             Thank you.

 8             MR. ANTON:  Thank you, your Honor.

 9             (Proceedings concluded.)

10
                       C E R T I F I C A T E
11

12             I hereby certify that the foregoing is an

13       accurate transcription of the proceedings in the

14       above-entitled matter.

15

16
                           /s/Lisa Edwards
17       _____       LISA EDWARDS, RDR, CRR
            DATE           Official Court Reporter
18                         United States District Court
                           400 North Miami Avenue, Twelfth Floor
19                         Miami, Florida 33128
                           (305) 523-5499
20

21

22

23

24

25
```